**GENERAL ELECTRIC COMPANY, Plaintiff-Appellee, v. INTERNATIONAL UNION UNITED AUTOMOBILE, AIRCRAFT, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (U. A. W.-C. I. O.), et al., Defendant-Appellants.**

Ohio Appeals, First District, Hamilton County.

No. 7639.   Decided September 8, 1952.

234

J. Mack Swigert, Robert T. Keeler, Cincinnati, for plaintiff-appellee.

Thomas F. Hilbert, Jr., New York City, N. Y., Charles Steele, Cincinnati, for plaintiff-appellee.

Sol Goodman, Cincinnati, for defendant-appellants.

(METCALF, J, of the Fourth District, sitting by designation in the First District.)

## OPINION

By THE COURT:

While this case was pending in the Common Pleas Court, a temporary restraining order was entered enjoining the defendants from committing any act in violation of a certain written contract entered into as of March 15th, 1951, between the plaintiff and the defendant unions, fixing wages, hours,

working conditions and other provisions as they affected the plaintiff's employees, who were members of said unions. An appeal from that order was attempted, which was dismissed by this court, on motion, on the ground that the order appealed from was not final, and, that, therefore, this Court had no jurisdiction to review it. That appeal is numbered 7632 upon the docket of this Court.

Thereafter, on a final hearing of the issues made by the pleadings, the Common Pleas Court found in favor of the plaintiff and a final judgment was entered granting a permanent injunction against the defendants. This appeal is from that judgment. We find part of the original papers filed under one number and part under the other. As the parties considered all of them filed under No. 7639, the Court will treat them as so filed.

On the trial de novo of the issues by this Court, the parties stipulated to submit the cause upon the record made in the Common Pleas Court, supplemented by the testimony of two witnesses taken before a Notary Public.

In its petition, the plaintiff alleges that the defendant unions and the individual defendants,—all members of one or both unions—are actively and in concert engaged in inducing and participating in a work stoppage and strike in violation of certain terms of a contract entered into between it and them to regulate their relations as employer and employee for one year from March 15th, 1951, and automatically renewable from year to year under the conditions therein set forth, to-wit: "and thereafter from year to year unless not later than sixty (60) days prior to any anniversary of the effective date of this Agreement either party notifies the other in writing of its intention to terminate this Agreement in which event the Agreement shall terminate on the anniversary date following the notice."

It alleges that neither party notified the other in writing of its intention to terminate the agreement, and that by its terms the contract will continue in effect until March 15th, 1953.

The plaintiff also alleges that the action of the defendants in engaging in a strike and work stoppage violates the following provision of said contract:

"Neither the Union nor its members will sanction, cause or participate in a sitdown, work stoppage, or a slowdown of work upon Company property. Nor shall the Union nor its members engage in a strike of any kind because of any grievance during the time such grievance is under discussion as herein provided.

"Any individuals causing or taking part in any action con-

trary to the provisions of this section shall be subject to disciplinary action at the discretion of the Company."

The plaintiff also alleges that the defendants, jointly and severally, have caused employes of the plaintiff to cease work and to absent themselves from its plant, have caused pickets to be stationed in great numbers at the entrances to its plant for the purpose of preventing employees and others having business with the plaintiff from entering its place of business, have made threats, engaged in mass picketing and acts of intimidation and coercion in furtherance of its purpose to enforce a work stoppage and block all means of ingress and egress at its place of business, all in violation of the above quoted provision of said contract and, that, by reason thereof, many employees and others having business with the plaintiff have been coerced and intimidated into not entering plaintiff's place of business and plaintiff has been forced to cease production which consisted in manufacturing jet engines under a contract with the United States of America, and which are of vital and emergent importance to it in its progress of preparation for National Defense, and cannot be obtained elsewhere.

The plaintiff also alleges that the defendants, unless restrained, will continue to violate their contract as aforesaid, to its irreparable damage and that the plaintiff has no adequate remedy at law.

The prayer of the plaintiff is for a temporary and permanent injunction, restraining the defendants from permitting to continue in effect any instructions, orders, requests or other communications therefor issued or communicated to the members of said unions and other employees to suspend work at its plant in Lockland, Ohio, or interrupt or impede such work or engage in a work stoppage or strike or in any other way interfere with production there. By its prayer, the plaintiff seeks a prohibitory injunction against engaging or encouraging others to engage in the many acts incident to a work stoppage and strike, and a mandatory injunction requiring the defendant unions to give written notice in such form as is approved by the court to all their members and to all the plaintiff's employees that the work stoppage and strike have ended and that they should return to work.

The defendants by answer deny that there is any contract as alleged by the plaintiff, deny the court has jurisdiction of the subject matter, and generally deny each and every allegation contained in the petition. However, at the trial, the defendants did not dispute that the unions and their members had jointly and severally quit work and engaged in picketing the plaintiff's business establishment and en-

deavored to dissuade persons from entering. In other words, they were conducting a strike against the plaintiff and would continue to do so until their demands were met, unless enjoined.

The plaintiff offered no evidence of any fraud, violence, intimidation, or other illegal acts that would be denounced by the law, and enjoined to prevent irreparable damage. The gravamen of the plaintiff's case is, that, assuming that in the absence of any contract, its employees would have the right to do all the acts complained of, these defendants have no such right, because they have surrendered such right in a binding enforceable contract. The defendants deny that any such contract exists now or existed at the time of the commission of the acts sought to be restrained.

It becomes necessary at the outset to examine the evidence to determine that issue.

There is no dispute that an agreement in writing containing the provisions heretofore quoted was entered into between the defendant unions and the plaintiff for one year ending on March 15th, 1952, unless automatically renewed by failure of either party to give notice as provided in Article XXV, heretofore quoted. The defendant unions claim that they gave a notice to terminate the contract more than 60 days prior to March 15th, 1952, and it is not disputed that a notice was given. The dispute is as to whether the notice served on the plaintiff by the defendant union was a notice to terminate, or a notice to modify or both, or an ambiguous notice, ineffective as either a notice to terminate or modify. The written contract was introduced in evidence, and to understand the controversy as to the legal effect of the notice served upon the plaintiff, we should have before us Article XXIV thereof. It is as follows:

"Within sixty (60) days prior to March 15, 1952, and of any subsequent year, either party to this Agreement may present to the other proposed modifications or revisions of any of the provisions hereof and the reasons for such recommendations. Within thirty (30) days after notice is given, a conference shall take place for the purpose of considering such modifications or revisions. Failing agreement on such proposed modifications or revisions, the Agreement shall continue in effect for the contract term."

The evidence shows that the defendant unions had printed and kept in supply a form of notice to be used by them when they desired to serve notice of their intention either to terminate or to modify. They used one of these forms to serve on the plaintiff. The following is a copy of that form, with

the blank spaces filled in the one served upon the plaintiff:—
"60-DAY NOTICE TO EMPLOYER

Date, January 3, 1952

To General Electric Company—Gas Turbine Division

    (Name of Employer as it appears in the contract)

Lockland Road, Lockland 15, Ohio

    (Address of Employer)

    This is a 60-day notice to you that we propose to (modify) (terminate) our collective bargaining contract.

    (Strike out one)

    We hereby request you to meet and confer with us for the purpose of negotiating the terms of a (modified) (new) contract.

|  |  |
|---|---|
|  | (The modifications which we propose are, (among other, as follows: |
|  | ( |
| (To be | (1. Wages |
| filled out | ( |
| if modifi- | (2. Automatic Progression |
| cations are | ( |
| proposed.) | (3. Classification |
|  | ( |
|  | (Etc. Union Security and other issues |

    While this notice is given pursuant to the Labor-Management Relations Act, 1947, the undersigned Union waives none of its rights and hereby expressly reserves all objections to the constitutionality, validity, and applicability of each and all of the provisions of said Act.

    International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, (UAW-CIO), Local No. 647

    (Name of local Union as it appears in the Contract)

By, GEORGE JENT—President

(Name and Title of each Officer signing this Notice)

Form of Notice Approved:

    January 4, 1951

        (Date)

By RAY ROSS, Director,

    Region No. 2A, UAW, CIO

Received Jan. 5, 1952

Labor Relations."

Congress took note of the unsettling effect of the sudden termination of a collective bargaining agreement and by placing certain restrictions upon the right sought to cushion the shock to the public economy. By Section 8 (b) (6) (d) of the Labor-Management Relations Act, Congress provided that:

"PROVIDED, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

'(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

'(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

'(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

'(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, 'whichever occurs later.' "

It will be observed that the limitations imposed relate to occasions when the purpose is to modify the contract as well as to when termination is intended, and equally to contracts at will as to contracts for a definite term. The contract under consideration here was prepared by draftsmen who were alert to the meaning of the language used, and, who, with such alertness, chose the language to express their intent.

There is evidence that within the time when notice of intent to terminate could be given one of the defendants orally informed the plaintiff that the written notice was intended as a notice of modification. There is also evidence that after such time had expired certain defendants contended that the notice was one of intent to terminate. All the ensuing bargaining related to modifications. Neither side submitted an offer containing all the terms of a proposed contract. The evidence shows that the negotiations relating to modifications were continuous. The plaintiff never refused to bargain.

In view of the law requiring a written notice, the effect of oral evidence·must be limited to placing the court in the

position of the parties, so that it may determine the meaning of the party as expressed in the written notice. It is not for the purpose of giving effect to an oral notice. The law specifically requires a writing, complete in itself, expressing an intent with reasonable clearness.

Now tested by this rule, of what does the writing notify the plaintiff?

As the expiration of the time within which a notice could be given approached, the defendants were confronted with the problem of weighing the advantages and disadvantages of seeking a termination on the one hand, or a modification on the other. Neither alternative promised benefits unmixed with detriment. Under the law as long as the contract continued the defendants were protected against interference by third persons with the contract relation. On the other hand, recognition of the continuance of the contract relation placed them at a disadvantage in negotiating for modification with their employer. This necessity for decision could not be evaded. They could not terminate and modify the same contract at the same time by the same notice. However, it seems, according to the defendants' testimony and contention, they attempted by the notice served upon the plaintiff to do just that, but in attempting to do both, they did neither. Such a notice cannot be construed to be a notice to terminate within the meaning of the Labor-Management Relations Act and Article XXV of the contract.

While we are of the opinion that the ambiguity of the notice destroys its effectiveness for any purpose, we are further of the opinion that if its service upon the plaintiff imposed a duty of inquiry as to its meanng, it was justified in relying upon the defendants' statement that it was a notice to modify. The insertion of the items of modification lent credence to that interpretation.

While Section (8) of the Labor-Management Relations Act requires the employer to bargain collectively until the minds of the parties have met and the contract relation established and, if desired by either party, its terms integrated into a written memorial, it does not require the employer to disregard the contract and continue to bargain as though no agreement had been reached, fixing the rights of the parties. This is recognized in the provision of Section (8), providing that the duty to bargain "Shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be re-opened under the provisions of the contract."

The only grievance or issue between the parties open for discussion at that time was whether a notice to terminate had been served upon the plaintiff. The plaintiff never refused to discuss that question. It seems that the plaintiff displayed a greater desire than the defendants on that subject. Having determined that a notice to terminate had not been served, the contract was automatically renewed for an additional year, and while it appears that plaintiff did bargain on the subject of modifications to become effective during the term of the renewed contract, it was under no legal compulsion to do so.

We conclude that the collective bargaining contract was automatically renewed for one year from March 15th, 1952, and that the parties were, and are bound by its terms.

The contention is made that the Court has no jurisdiction of the subject matter of this action. It is, of course, conceded that the Courts of Common Pleas of Ohio are courts of general law and equity jurisdiction, and that this court, on appeal on questions of law and fact therefrom, has general equity jurisdiction to pass upon the issues as though it had been granted original jurisdiction over the cause. But it is asserted that under the National Labor Relations Act (29 U. S. C. A. 151, et seq.) and the Labor-Management Relations Act of 1947 exclusive jurisdiction to enforce collective bargaining agreements, therein referred to, has been conferred upon the Federal Courts.

It cannot be seriously questioned at this time that employees had a right, prior to any Federal legislation on the subject, to join together and agree collectively with their employer as to wages and other conditions of their employment. Such an agreement in the absence of any legislation would constitute a valid contract, enforceable in any State court of general jurisdiction, where service of summons could be obtained.

Nor can it be questioned that Congress can by express legislative declaration withdraw contracts relating to interstate and foreign commerce from the jurisdiction of the states and retain to the Federal government the exclusive jurisdiction to enforce such contracts. 54 Am. Jur., (Sec. 344), 966. And where the subject is inherently National and all state control is excluded, the jurisdiction of the Federal Courts is exclusive. The subject with which we are dealing is not inherently national.

We believe it is equally clear that where a new right is created or a new duty imposed by a statute and the statute prescribes a remedy for the enforcement of the right or duty,

the remedy thus prescribed is exclusive. **37 O. Jur., 791, et seq.** However, the corollary from these propositions is just as firmly established that if exclusive jurisdiction is not expressly retained and the legislation relates to rights and duties already recognized and enforced by the law, the legislative provision for a remedy is constructed to be cumulative and not exclusive. The established rule of statutory construction is to treat a statutory remedy to enforce an existing right or duty as an additional remedy, leaving the existing remedies unaffected. id., 793.

Upon this subject, as it applies to the exercise of jurisdiction by State and Federal Courts of rights and duties falling within the domain of concurrent State and Federal power, but where the Federal power is supreme, it is said in 14 Am. Jur., 441:

"in regard to state courts the law is also said to be settled that courts of general jurisdiction therein have power to decide cases involving the rights of litigants under the Constitution or statutes of the United States unless deprived of the right so to do by the terms of the Federal Constitution or acts of Congress."

And, at 442, et seq:

"While the provisions of the Constitution as to the extent of the Federal Judicial power do not, of themselves and without more, exclude the jurisdiction of state courts, the judicial power of the United States is, in some cases, unavoidably exclusive of all state authority, and in all others, may be made so, at the election of Congress, exclusive jurisdiction being uniformly attendant upon exclusive legislation. If, however, exclusive jurisdiction is not thus given, state courts are generally held to have concurrent jurisdiction, since either express words of exclusion or a manifest repugnancy to the exercise of state authority is required. It is, however, a principle applicable to judicial powers that where the exercise of state authority is incompatible with the exercise of Federal authority, the state authority is superseded without express words. Therefore, it is held that where a United State statute gives a right without specifying a remedy, it may be prosecuted in a state court; but where a right is thus given and a specific remedy provided, or a new power and the means of executing it are therein granted, such right and power can be enforced only in the method provided by such statute."

A reading of the National Labor Relations Act and the Labor Management Relations Act is sufficient to disclose that new rights and new duties are created, as, for instance, the duty of the employer to negotiate in good faith on terms

of employment with a representative chosen by his employees without interference by him. And it is clear that as to these new rights and duties, the remedy provided by the Act is exclusive. The National Labor Relations Board is clothed with the administrative jurisdiction to enforce these new rights and duties in the first place, subject to review by the Federal Courts. Unfair Labor practices, as defined by Section 8 of the National Labor Relations Act, are the most distinctive new rights and duties created by the Act, the enforceability of which is confided to the National Labor Relations Board to the exclusion of jurisdiction of any and all State courts.

But a collective bargaining agreement may, and the one before the court does, include many provisions on subjects upon which the parties were free to act. They were free to contract collectively—and still are. They were and are free to provide for the automatic renewal of the terms of a contract and to provide against work stoppages and strikes.

Now, let us examine the statute. We find that it creates a Board (National Labor Relations Board) to enforce the provisions relating to unfair labor practices by employers and employees, as listed and defined in Section 8 of the Act, and to exercise certain investigatory, supervisory and conciliatory functions. No provision for judicial review of the investigatory, supervisory and conciliatory action of the Board is provided, but we assume that any invasion of personal or property rights could be redressed by the appropriate remedies. But, by Section 8 the Board is empowered "to prevent any person from engaging in any unfair labor practice (listed in Section 8) affecting commerce," and in that Section is found the first reference to the judicial branch of government. The Board is required to conduct its hearings of charges of unfair labor practices in accordance with the rules of procedure and evidence applicable in district courts of the United States, and the Board is given power to petition the United States Circuit Courts of Appeals for the enforcement of its orders made in such unfair labor practice proceedings, or to a United States District Court, if no Court of Appeals is in session at the time. That Court is given jurisdiction to grant temporary relief by injunction or otherwise pending final hearing, at which the court may affirm, modify and enforce, or reverse the order under review. However, the Court is required to consider all findings of fact by the Board as conclusively proven if supported by substantial evidence. The jurisdiction of the United States Courts of Appeals is expressly made exclusive with right of appeal as in other cases. Any person aggrieved by the final order of the Board is given the same right to in-

voke the jurisdiction of the United States Circuit Court of Appeals or District Court for a review.

The Board is also given the right to invoke the jurisdiction of the United States District Court for temporary relief or restraining order, but this applies only upon complaint of an unfair labor practice having been filed with the Board, or when the Board finds by investigation that a complaint should be filed, and whatever order is made expires upon the making of the final order disposing of the complaint of unfair labor practice.

The Board is also given authority to invoke the jurisdiction of the United States District Courts to punish contumacious witnesses and to compel witnesses to obey their subpoenas.

It seems manifest that the foregoing provisions for intervention by the United States Courts for particular or temporary purposes, even though their jurisdiction is expressly made exclusive shed no light upon the intent of Congress, or indicate in any way its intent to limit or exclude the jurisdiction of other courts upon subjects entirely foreign to the particular or temporary purpose to which it was addressing itself.

In this action, the jurisdiction of this Court is not invoked to enforce any unfair labor practice, as listed and defined in Section 8. While the National Labor Relations Board's jurisdiction is not expressly made exclusive, except as to unfair labor practices defined in Section 8, we assume that it is exclusive as to all unfair practices created by the Act. Its jurisdiction to hear and decide does not purport to extend beyond that sphere, and this Court has no jurisdiction to enter it.

The only reference in the Act to actions on contracts between an employer and a labor organization is found in Section 301. We quote the entire Section excepting paragraph (e) which is of no importance in the construction of the balance of the Section:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this Act and any employer whose activities affect commerce as defined in this Act shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in

behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.

"(c) For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.

"(d) The service of summons, subpoena, or other legal process of any court of the United States upon an officer or agent of a labor organization, in his capacity as such shall constitute service upon the labor organization."

The first thing that strikes one on reading this section is that while Congress expressly made the jurisdiction of the United States Circuit Courts of Appeal exclusive, it refrained from making any comparable provision as to the jurisdiction of the district courts in actions for breach of contract between employers and labor organizations.

It also strikes one that the language is permissive rather than mandatory.

We also note that in paragraph (b) a labor organization may sue or be sued as an entity "in the Courts of the United States," and that any money judgment against it in such action shall be enforceable against the entity and its assets and not against any individual member or his assets. We attach no significance to this limitation of the applicability of the provsion to the United States Courts other than that Congress thereby recognized its lack of constitutional power to provide a judicial code for state courts.

The only implication we can draw from the exemption of the Union members from individual liability on money judgments is that relief other than a money judgment could in an appropriate case, be obtained in a United States District Court against the individual members of the Union without any additional legislation within the limitations of existing law.

The reference to Section 301 in paragraph (b) 303 casts no light upon the intent of Congress on this subject.

So we come to the question of whether the mere conferring of jurisdiction upon the United States District Courts over a subject historically and constitutionally within the jurisdiction of state courts of general jurisdiction excludes the

state courts from such jurisdiction. Concededly, Congress has the power to exclude state courts from exercising jurisdiction over controversies arising out of interstate commerce by express words of exclusion, but in the absence of clear words of exclusion, should such a radical departure be implied?

See: 14 Am. Jur., 441, heretofore quoted.

Congress clearly indicated that it did not regard recourse to the United States Courts for the enforcement of the valid provisions of a collective bargaining agreement as an impingement upon the power of the National Labor Relations Board to prevent unfair labor practices defined in Section 8 of the Act or of any other power or duty with which it clothed it. We have been given no reason for denying to State Courts jurisdiction in the same field. If any implication can be drawn from the provision conferring jurisdiction upon the United States Courts, we think it would be that Congress recognized that the field was appropriate for judicial intervention, and, for that reason, clothed the district courts with jurisdiction so that they would be in a position to share in the added burden. We fail to find any word or combination of words indicating an intent to exclude the state courts or to draw to the United States District Courts the exclusive jurisdiction.

The language of the Act is permissive and non-exclusionary. We discover no intent to use "may" in other than its ordinary sense. In 50 Am. Jur., 51 and 52, it is said: "However, it should be helpful to keep in mind the fundamental rule that ordinarily the words 'may' and 'shall' or 'must' are not used interchangeably or synonymously, but are given their ordinary meaning. When the use of the words in other than their ordinary meaning is intended, the intention to do so must clearly appear."

Having concluded that the Court has jurisdiction, we turn now to a more specific consideration of the terms of this contract, the evidence relating to its breach and the relief to which the plaintiff is entitled in the event we find that there has been a breach.

Now as to the terms of the contract. In Article XXI of the contract, in which is found the· provision aganst sitdowns, work stoppages, and strikes, hereinbefore quoted, is found the procedure for the adjustments of "grievances" commencing with its discussion by the employee with his foreman, then by reference to the Bargaining Committee that may refer it to the Management Committee, then to the Plant Manager, then to representatives of the international Union for dis-

cussion with Executive Department of the Company. If no settlement is reached and the grievance "involved the application or interpretation of the contract," either party may request that it be submitted to arbitration for final decision.

By Section 501 of the Labor-Management Relations Act, Congress defined "strike" as including "any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slow-down or other concerted interruption of operations by employees."

It is not disputed that the defendants and the other employees of the plaintiff represented by them were engaged in the activities defined in Section 501. The interpretation and application of that provision of the contract relating to its automatic renewal were under discussion at the time. It seems to us that the situation, therefore, calls for the application of the contractual provision against a strike.

We, therefore, hold that the defendants have violated the contract by engaging in a strike.

Finally, we reach the nature of the relief afforded for the breach of a contract of this character. Counsel points out that no American court can compel a person to work against his will except as a punishment for crime, and that the breach of a simple contract is not, and cannot be made, a crime. There can be no doubt about the soundness of that position. The XIII Amendment to the Constitution of the United States abolished slavery and involuntary servitude except as a punishment for crime. It cannot be revived in any form. Congress, in obedience to the XIIIth Amendment expressly provided in Section 502 of the Act that nothing in the Act "shall be construed to require an individual employee to render labor or service without his consent nor shall anything in this Act be construed to make the quitting of his labor by an individual employee an illegal act; nor shall any court issue any process to compel the performance by an individual employee of such labor or service."

So, it is clear beyond cavil that any attempt by this or any other American Court to compel a person to labor against his will except as a punishment for crime would be utterly void under the XIIIth Amendment of the Constitution of the United States, and contrary to the express prohibition of the National Labor Relations Act and the Labor-Management Relations Act.

It should be said here, however, that long before the ratification of the XIIIth Amendment, and while execution against the person and imprisonment for debt were standard pro-

cedure at common law for the enforcement of money judgments, based on simple contractual obligations, courts of equity had established the principle that it would not by injunction or any other process compel or attempt to compel the actual performance of personal service, particularly continuous personal service over a long period of time. The reason given for such refusal to give relief was the impracticability of enforcing such a decree, and where the reason, upon which the rule was based, did not exist, courts of equity have granted injunction, coercing the performance of personal acts. Of course, this never extended to attempting to establish and maintain the relation of employer and employee by injunction.

We do not understand that the plaintiff is seeking a mandatory injunction, requiring the defendants to return to work and to continue to perform service. It does ask the Court to enjoin the defendants from concerted action, from permitting to continue in effect any instructions to suspend work or interrupt or impede such work or engage in a work stoppage or strike or any interference with production in plaintiff's place of business, or from giving publicity to any instructions counseling such action; and from violating any of the terms of the contract and from encouraging any employee or other person to interfere by strike or in any other way with work in plaintiff's plant. It also prays the court to enjoin picketing, coercion, threats, violence, inducement or breach of the contract, or aiding and abetting others in such action; from lending financial support, and, finally, to require the defendant unions to give written notice to their members and all other employees of plaintiff that "the said strike and work stoppage is ended and notify such employees to return to work on their next regular shift."

It seems to us that the granting of this relief in its entirety would clearly violate the XIIIth Amendment of the United States Constitution and the express prohibition of the Labor-Management Relations Act, and the traditional refusal of courts of equity to compel by injunction the performance of personal service.

But the fact that the plaintiff seeks some relief that is beyond the power and discretion of the court to grant, does not deprive it of the right to insist that the court award to it the relief to which the facts entitle it and which is within the jurisdiction of the Court to grant.

That Congress recognized that the subject of labor relations was, or might be appropriate for the exercise of equitable jurisdiction is disclosed by the provisions of Secton 10

of the National Labor Relations Act, authorizing the United States Courts "to grant such temporary relief or restraining order as it deems just and proper," as an aid to the Board and a protection to others, in the enforcement by the Board of the prohibition against unfair labor practices listed in Section 8 of the Act. And as we interpret those provisions, the United States Courts would grant the appropriate relief without any preliminary inquiry as to whether the law provided an adequate remedy. However, in this case it is manifest that the legal remedy is inadequate.

The declared purpose of the National Labor Relations Act and the Labor-Management Relations Act is to promote the normal flow of commerce and the full production of articles and commodities for such commerce. They must be construed in the light of that policy and courts within their jurisdiction must afford the remedies in harmony therewith.

Certainly, there is nothing in the National Labor Relations Act or the Labor-Management Relations Act that indicates that a state court should withhold any remedy for the breach of a collective bargaining agreement that would be available under similar circumstances for the violation of the terms of a contract of any other character.

It is the inadequacy of the remedy at law for damages for breach of the contract that is the basic reason for equitable intervention. The remedy afforded must not violate any constitutional right.

In reaching the conclusion that injunction within the constitutional limitation is an appropriate remedy for the breach of this contract, we cannot ignore the fact that this plaintiff is under contract with the United States Government to manufacture jet engines at this factory, and that two-thirds of the available supply of such engines are manufactured there. These engines are needed in preparation for National Defense. The public has an interest in the uninterrupted production of these engines. The public interest has been held to outweigh the inconvenience of supervision, and to require the granting of the relief.

In 49 Am. Jur., 87, it is said:—

"Difficulties in regard to supervision will not be allowed to deter a court of equity from granting specific performance of a contract where public interest seems to require it, and when the inconvenience of the courts in acting is more than counterbalanced by the inconvenience of the public if they do not act, the interest of the public will prevail."

If a court of equity will grant specific performance under such circumstances, there certainly can be no reason to with-

hold its injunctive process. And if public inconvenience will move the court to act, surely a threat to public safety should.

On the subject of inconvenience of enforcing a contract involving personal service, it is said in Standard Fashion Co. v. Siegel-Cooper Co., 43 L. R. A. (N. Y.) 854, at 857.

"Contracts which require the performance of varied and continuous acts, or the exercise of special skill, taste, and judgment, will not, as a general rule, be enforced by courts of equity, because the execution of the decree would require such constant superintendence as to make judicial control a matter of extreme difficulty. Rutland Marble Co. v. Ripley, 10 Wall. 339, 358, 19 L. Ed 955, 961; Beck v. Allison, 56 N. Y. 366, 370, 15 Am. Rep. 430; Gervais v. Edwards, 2 Dru. & W. 80; Blackett v. Bates, L. R. 1 Ch. 117; Fargo v. New York & N. E. R. Co. 3 Misc. 205; Pom. Spec. Perf. Sec. 312; Fry, Spec. Perf. Section 69. An exception to this rule, founded upon the rights of the public rather than those of the plaintiff, obtains with reference to contracts relating to the management and control of railroads and other agencies of transportation which enjoy special privileges conferred by statute, and promote the general welfare. Joy v. St. Louis, 138 U. S. 1, 47, 34 L. Ed. 843, 858; Prospect Park & C. I. R. Co. v. Coney Island & B. R. Co. 144 N. Y. 152, 26 L. R. A. 610. When the inconvenience of the courts in acting is more than counterbalanced by the inconvenience of the public if they do not act, the interest of the public will prevail. But even if, upon a trial of the action, specific performance of the contract in its entirety were refused as impracticable, still the bill should be retained as one permitting an injunction, in the sound discretion of the court, to restrain the defendants from violating the negative and severable covenant of the Siegel-Cooper Company that it would not 'sell, or allow to be sold, on its premises, during the duration of this (the) contract, any other make of paper patterns' than those of the plaintiff. The learned appellate division, one of the judges dissenting, overruled the demurrers on this ground, holding that the court should extend its remedy as far as it is able, and thus prevent the principal defendant, not only from making money by breaking its agreement, but from inflicting a double wrong upon the plaintiff by depriving it of the right to sell, and conferring that right on a business competitor. We think this is a sound and just conclusion, because it will compel the Siegel-Cooper Company to either perform its agreement or lose all benefit from breaking it, and at the same time will shield the plaintiff from part of the loss caused by the breach, if persisted in."

Upon the whole case, we find that the plaintiff is entitled to some, but not all of the relief prayed for. The plaintiff is not entitled to an injunction requiring the defendants or any member of defendant unions to resume or continue to work, and as the Court has no power to order the resumption or continuance of work by any one, it has no power to direct any defendant to give such an order to others.

The Court has power to and will by its injunctive writ require the withdrawal of all communications, heretofore issued to defendant unions' members, indicating to them that a work stoppage or strike should be instituted or continued, but this withdrawal should be so worded as to leave the individual his free choice to resume or continue to work without restraint or compulsion from any one.

The defendants will also be restrained from engaging in any combination or agreement to stop work or strike, or to influence the union members not to work. They will be restrained from picketing and from doing any act that would induce or encourage any member of their unions to breach the contract not to stop work or strike.

For these reasons, and to this extent, the Court finds in favor of the plaintiff.

HILDEBRANT, PJ, MATTHEWS & METCALF, JJ, concur.