## McLEAN DISTRIBUTING COMPANY, INC. v. BREWERY AND BEVERAGE DRIVERS, WAREHOUSEMEN AND HELPERS UNION, LOCAL NO. 993, AND OTHERS.

94 N. W. (2d) 514.

January 23, 1959—No. 37,739.

*Mandt Torrison, James C. O'Neill,* and *Bundlie, Kelley & Maun,* for relator.

*Robins, Davis & Lyons, Solly Robins, Erwin A. Peterson, Willard L. Converse,* and *Eugene T. Williamson,* for respondents.

KNUTSON, JUSTICE.

This is a petition for a peremptory writ of mandamus to compel the District Court of Ramsey County to take and exercise jurisdiction in an action brought to obtain injunctive relief from an alleged unauthorized and illegal strike.

The principal facts are not seriously in dispute. Relator, McLean Distributing Company, Inc., referred to hereinafter as McLean, has been engaged for a number of years in the business of selling and distributing various brands of beer and soft drinks in and near the city of St. Paul. These brands have varied from time to time. McLean is a wholesaler in that it buys the products of various manufacturers and resells them at a marked-up price. Deliveries of such products are made by truck. Respondent Brewery and Beverage Drivers, Warehousemen and Helpers Union, Local No. 993, referred to hereinafter as the respondent union, is the duly certified bargaining agent for McLean's employees.

On or about July 1, 1957, McLean and respondent union negotiated and executed a contract covering the working relations between McLean and its employees, which by its terms expires on June 30, 1959. While this contract was executed separately by McLean, it is identical with that executed with other distributors of like products in the same general area. The pertinent portions of this contract are:

*"Section 1. Recognition as Bargaining Agent.* The Employer recognizes the Union as the sole collective bargaining agent for the employees in the classifications covered by this agreement as certified by the National Labor Relations Board.

*"Section 2. Union Shop.* The Employer shall have the right to choose any person as a new employee. All employees now within the unit who

have been employed for thirty (30) days or more, and all other employees after thirty (30) days of employment, shall become members of the Union and shall thereafter maintain membership in good standing as defined by the National Labor Relations Act as a condition of continued employment.

"*Section 3. Union Assistance in Securing New Employees.* The Union agrees to prepare and maintain a list of men available for hire who possess the necessary qualifications to employment, and shall furnish the same and such additional information relative thereto as it has available if any employer requests it.

\* \* \* \* \*

"*Section 5. Contract Provisions Controlling.* No agreement between Employers and employees conflicting with the terms and provisions hereof shall be valid and enforceable.

"Both the Employer and the Union will be bound by the terms hereof during the period set forth herein regardless of any claimed collateral agreements or understandings unless such amendments or modifications are made a part hereof by express written stipulation and in the event any question arises of adherence to the provisions of this agreement, no contract, or understanding between the Employers and the employees shall prevail as against the provisions of this agreement.

"No employee covered by this agreement shall have the right to vary the terms or provisions hereof without the express written consent of the Union and the Employer.

\* \* \* \* \*

"Article VI.

"*Grievance and Arbitration*

"Any controversy arising over the interpretation of or adherence to the terms and provisions of this agreement shall be settled promptly by negotiations between the Employer and the employee or a Union representative, provided if negotiations are with an employee, the bargaining representative of the Union has been given an opportunity to be present. If no adjustment satisfactory to both parties can be reached in this way, then the matter shall be settled by a Board of Arbitrators upon written demand of either party upon the other within ten (10) days of the occurrence of the dispute.

"[Thereafter follow specifications as to the manner in which the arbitration shall be conducted.]

\* \* \* \* \*

*"There shall be no strike or lockout during the period herein provided for arbitration.*

\* \* \* \* \*

## "ARTICLE XII.

### *"Effective and Termination Dates*

"This Agreement shall take effect as of July 1, 1957 and shall continue in effect until June 30, 1959, inclusive. *This Agreement may be reopened as of July 1, 1959* for changes or modifications herein, or termination hereof, by either party giving sixty (60) days advance written notice to the other of its intent to do so. If neither party reopens this contract as herein provided, it shall automatically be extended from year to year thereafter with like provisions for reopening as of the annual date of July 1." (Italics supplied.)

Among other things, the contract provides for seniority rights of employees.

Prior to November 7, 1958, the Hamm Brewing Company, referred to hereinafter as Hamm's, distributed its own products in the city of St. Paul by trucks owned by it and driven by its employees. Respondent union was the certified bargaining agent for Hamm's employees, as it was for those of McLean. On or about November 7, 1958, Hamm's decided to discontinue distribution of its own products. It then entered into an agreement with McLean under which McLean became the distributor of Hamm's beer in the city of St. Paul. Some or all of the trucks formerly used by Hamm's were sold to a corporation affiliated with McLean. Hamm's terminated the employment of some 64 persons formerly engaged in the sale and distribution of its beer. McLean commenced distribution of Hamm's beer on November 10, 1958. Prior to doing so, it notified the former employees of Hamm's who had been discharged that they could, if they desired, apply for work with McLean. Some of them did so, and, as a result thereof, McLean employed 48 of Hamm's former employees. They began working for McLean, doing the same work as the original McLean employees. The contract which

the union had with Hamm's was more favorable to the employees, in some respects, than the contract which it had with McLean. This may have been due to the fact that Hamm's employees were engaged both as salesmen and distributors whereas McLean conducted the selling operation independently from the distribution. After McLean had hired some of Hamm's former employees, the union contended that McLean was under an obligation to bargain with it separately with respect to working conditions of Hamm's former employees. McLean claimed that it had a contract covering all its employees which was not subject to renegotiation or reopening during its term.

On or about December 1, 1958, respondent union called a meeting of the former Hamm's employees. The original McLean employees were excluded from such meeting. Those attending that meeting voted in favor of going on a strike. Thereafter, McLean's place of business was picketed with signs reading "McLean-Hamms Distr. UNFAIR to Brewery and Beverage Drivers Local 993." McLean's employees were told by the pickets that they could deliver all beer except Hamm's. Drivers who took out mixed loads of beer, including Hamm's beer, were threatened with reprisals such as being blackballed from the union and other injury. None of the former Hamm's employees who had been hired by McLean remained at work. McLean informed them by telegram that they must return to work or they would be replaced. When none of them returned to work, each was notified that he had been discharged. It is claimed that as a result of the picketing McLean has lost all sources of beer for distribution except Hamm's.

On December 2, 1958, McLean commenced an action for injunctive relief, alleging unfair labor practices under M. S. A. 179.06 and 179.11(1, 2, 4, 7, 8).[1] The trial court issued a temporary restraining order prohibiting the picketing until the matter could be heard. In

---

[1]M. S. A. 179.11(1) reads:

"It shall be an unfair labor practice:

"(1) For any employee or labor organization to institute a strike if such strike is a violation of any valid collective agreement between any employer and his employees or labor organization and the employer is, at the time, in good faith complying with the provisions of the agreement, or to violate the terms and conditions of such bargaining agreement."

order to obviate the necessity of introducing evidence on that phase of the case, the parties entered into a stipulation that for the purpose of this case it would be admitted that McLean was engaged in interstate commerce within the meaning of the National Labor Relations Act. A hearing was held, and, after making some findings of fact, the trial court determined that the state court lacked jurisdiction over the controversy and denied any relief. The restraining order theretofore issued was discharged. We then issued a show-cause order on an application for a peremptory writ of mandamus requiring the trial court to accept jurisdiction and to proceed to try and determine the case on its merits and to grant such relief as relator was entitled to.

The principal question now before us is whether, under the facts of this case, the courts of this state may exercise jurisdiction over the controversy involved and grant injunctive relief.

A preliminary question arises as to whether mandamus is available to compel the trial court to accept jurisdiction of the controversy. Respondent union concedes that this court may, by mandamus, compel an inferior court to act where it refuses to do anything but contends that mandamus is not available when the court has acted by determining that it has no jurisdiction. While this argument poses a fine distinction, we think that it lacks substance. The result to a party who faces irreparable harm is the same whether the court decides that it can do nothing and simply refuses to act, without expressing its determination, or if it expressly states that it has no jurisdiction and declines to act. We think that the general rule, as stated in 35 Am. Jur., Mandamus, § 254, is the proper one to be followed here. The rule as there stated is:

"* * * One of the ancient offices of the writ, in fact, was to compel action by lower judicial tribunals. It seems to be thoroughly settled that where a lower court without sufficient reason, neglects or refuses to act upon a matter within its jurisdiction, properly brought before it, mandamus will issue at the instance of one entitled to invoke the remedy, to compel it to assume jurisdiction and proceed to a determination of the cause, * * * unless the aggrieved party has a remedy by appeal or error which is adequate. But the mere fact that there is a remedy by

appeal or error will not preclude mandamus for the purpose of compelling the exercise of jurisdiction where the remedy by appeal or error would be inadequate. *The power by mandamus to compel a subordinate judicial officer to proceed with the trial and the determination of a case which it is his duty to hear and decide includes the power to compel him to reverse an erroneous decision that he will not proceed with such trial and judgment.*" (Italics supplied.)

Our decisions are in accord. In State ex rel. Prall v. District Court, 126 Minn. 501, 503, 148 N. W. 463, the proper use of a writ of mandamus is stated as follows:

"Mandamus is an extraordinary remedy. It is not needed if there is an adequate remedy in the ordinary course of law. Its purpose is not to correct errors and it is not the substitute for an appeal. It will compel judicial action and the exercise of jurisdiction. It will not direct the manner of its exercise or control judicial discretion.

\* \* \* \* \*

"We are of the opinion \* \* \* that when there is no discretion in the district court to decline jurisdiction, and the question arises at the commencement of the trial, and the record properly presents the question, mandamus is an appropriate remedy."

In State ex rel. Gresham v. Delaney, 213 Minn. 217, 219, 6 N. W. (2d) 97, 98, we reviewed our cases on the subject and said:

"*Mandamus* will issue to compel judicial officers in the same manner and to the same extent as other public officers to perform duties with respect to which they plainly have no discretion as to the precise manner of performance and where only one course of action is open. *Mandamus* is not a substitute for, and cannot be used as, an appeal or writ of error. Ordinarily, where a party has an adequate remedy by appeal, a writ of *mandamus* should be denied. \* \* \*

"\* \* \* where the duty does not permit the exercise of any discretion with respect to its performance and only one course of action is open and where the aggrieved party does not have an adequate remedy by appeal, *as where the duty is to entertain jurisdiction of an action and the court refuses to do so* \* \* \* the writ will issue; \* \* \*." (Italics supplied.)

Jurisdiction involves the power to decide the controversy.[2] Where jurisdiction is declined, it involves a refusal to act. Except in those cases where the court has a discretionary right to do so, mandamus may be the only way in which a litigant can secure relief that will prevent irreparable harm. In a similar manner, prohibition is available to prevent the unauthorized exercise of jurisdiction.

The evidence in the case before us indicates that McLean has already lost the distribution of all brands of beer except Hamm's as a result of the picketing. Stoppage of distribution of Hamm's beer would involve a loss to McLean of a gross income of about $4,000 per day and of about $12,000 to Hamm Brewing Company. Continued picketing could well destroy the entire business of McLean. Under these circumstances, we do not believe that it can be said that the right of appeal, with its inherent delay in obtaining a decision, would furnish an adequate remedy. On the showing made, we are satisfied that the matter should be disposed of by mandamus.

The same result has been reached by other courts. See, Ex parte Simons, 247 U. S. 231, 38 S. Ct. 497, 62 L. ed. 1094; Ex parte Nebraska, 209 U. S. 436, 28 S. Ct. 581, 52 L. ed. 876; In re Connaway, 178 U. S. 421, 20 S. Ct. 951, 44 L. ed. 1134; In re Grossmayer, 177 U. S. 48, 20 S. Ct. 535, 44 L. ed. 665; State ex rel. Happel v. District Court, 38 Mont. 166, 99 P. 291, 35 L.R.A. (N.S.) 1098, 129 A. S. R. 636; State ex rel. McGovern v. Williams, 136 Wis. 1, 116 N. W. 225, 20 L.R.A. (N.S.) 941; Brown v. Kalamazoo Circuit Judge, 75 Mich. 274, 42 N. W. 827, 5 L. R. A. 226.

We come then to the main issue in the case, namely, whether, under the record we have before us, the state court has jurisdiction to act in the controversy.

As near as we can determine respondent union's position, it is: (1) That when the individuals formerly employed by Hamm's were hired by McLean they had a right to continue to work under the contract executed by Hamm's or to be considered as a separate bargaining unit; or (2) that the National Labor Relations Board had exclusive jurisdiction over the question as to whether respondent union was the bargaining

[2]Swanson v. Alworth, 159 Minn. 193, 198 N. W. 453.

agent for such employees and had a right to bargain for them as a separate bargaining unit for a new contract with McLean.

It seems to us that much of the difficulty in this case arises from the refusal of respondent union to face the real issue before us. In its brief, respondent union, among other things, says:

"We deem the following concept fundamental: Federal law precludes state jurisdiction over any alleged unfair labor practice affecting interstate commerce and the N.L.R.B. has exclusive power to deal with such problems, whether or not it has been called upon to exercise that authority."

The weakness of this contention is two-fold. In the first place, the mere allegation of an unfair labor practice, without any evidence to substantiate it, does not establish the alleged fact. In determining whether the trial court has jurisdiction we must take the evidence as we find it in the record before us. It must be conceded that, if the record had established that the dispute involved the unfair labor practice alleged by the union, the National Labor Relations Board would in all probability have exclusive jurisdiction. There are some areas, however, where the state courts have been held to have jurisdiction even though the conduct involved is held to be an unfair labor practice under the Federal act.[3] Aside from these areas, Congress has not preempted the entire field but has left some areas open in which the state courts may exercise jurisdiction.[4] After reviewing many of the cases on this subject, the United States Supreme Court, in International Brotherhood of Teamsters v. Vogt, Inc. 354 U. S. 284, 289, 77 S. Ct. 1166, 1169, 1 L. ed. (2d) 1347, 1351, said:

"* * * These cases made manifest that picketing, even though 'peaceful,' involved more than just communication of ideas and could not be immune from all state regulation."

In International Union, U. A. W. A. v. Wisconsin Board, 336 U. S.

---

[3]Cf. International Union U. A. W. v. Russell, 356 U. S. 634, 78 S. Ct. 932, 2 L. ed. (2d) 1030; International Assn. of Machinists v. Gonzales, 356 U. S. 617, 78 S. Ct. 923, 2 L. ed. (2d) 1018; 43 Minn. L. Rev. 341.

[4]For note on right of state courts to act when the National Labor Relations Board declines to act, see 39 Minn. L. Rev. 911; 43 Minn. L. Rev. 342.

245, 254, 69 S. Ct. 516, 521, 93 L. ed. 651, 663, rehearing denied, 336 U. S. 970, 69 S. Ct. 935, 93 L. ed. 1121, the court said:

"* * * There is no existing or possible conflict or overlapping between the authority of the Federal and State Boards, because the Federal Board has no authority either to investigate, approve or forbid the union conduct in question. This conduct is governable by the State or it is entirely ungoverned."

While we have not had occasion to pass on the specific question involved here,[5] we have had occasion a number of times to review the decisions of the United States Supreme Court on questions involving the right of our court to act in this field.[6] It would serve no useful purpose to again review them in detail. In Norris Grain Co. v. Seafarers' International Union, 232 Minn. 91, 99, 46 N. W. (2d) 94, 100, we said:

"The law is now settled that where a case involves a labor dispute in the field of interstate or foreign commerce *covered by the national Labor Management Relations Act,* 1947, the National Labor Relations Board * * * has exclusive jurisdiction and the state courts have none. It is not a question of whether N.L.R.B. has acted or what its action will be, but rather whether congress has asserted its power to regulate that relationship." (Italics supplied.)

McQuay, Inc. v. International Union, U. A. W. 245 Minn. 274, 72 N. W. (2d) 81, affirmed, 351 U. S. 959, 76 S. Ct. 1024, 100 L. ed. 1481, is an illustration of the type of case in which the state courts have been held to have power to act. That case dealt with the exercise of the state's police power in restraining acts of violence in connection with picketing. After dealing with the areas in which Congress has preempted the field and in which the state is precluded from exercising jurisdiction, we said (245 Minn. 278, 72 N. W. [2d] 84):

"* * * the United States Supreme Court continues to rule that congress has not withdrawn from the states the right to act to prevent violence;

---

[5]See, 38 Minn. L. Rev. 776.

[6]For a comprehensive discussion of the subject, see *The Minnesota and National Labor Relations Acts—A Substantive and Procedural Comparison,* 38 Minn. L. Rev. 730.

that congress designedly left open an area for state control, it having manifested no intention thus far to exclude states from exercising their police power."

Thus, it seems clear that, where an act complained of is one that is protected by the National Labor Relations Act, the National Labor Relations Board has exclusive jurisdiction[7] but that there is an area which is not covered by the Federal act in which Congress has not preempted the field and in which the state courts are free to act.

Among the areas left open for the exercise of jurisdiction by the state courts is that of enforcing existing contracts that are not open to negotiation. In the enactment of the Taft-Hartley Act a proposal was contained in the senate version of the act to include breach of contract as an unfair labor practice. This provision was deleted in conference with the observation:

"Once parties have made a collective bargaining contract the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board."[8]

In International Union, U. M. W. v. National Labor Relations Board, 103 App. D. C. 207, 211, 257 F. (2d) 211, 215, the court said:

"The Board says, rightly, that a strike in violation of an agreement not to strike is an unprotected labor activity The Supreme Court of the United States so held long before there was any legal provision for unfair labor practices by Unions. N.L.R.B. v. Sands Mfg. Co., 306 U. S. 332, 59 S. Ct. 508, 83 L. Ed. 682. The Board has frequently so held. See, e. g., W. L. Mead, Inc., 113 N.L.R.B. 1040. Employees who strike in violation of such an agreement may be discharged, with

[7]In addition to the cases mentioned above, see Faribault Daily News, Inc. v. International Typographical Union, 236 Minn. 303, 53 N. W. (2d) 36; State ex rel. International Union, Local 1174, v. Finkelnburg, 236 Minn. 349, 53 N. W. (2d) 128.

[8]H. R. Conf. Rep. No. 510, 80th Cong. 1st Sess. p. 42; see Association of Employees v. Westinghouse Elec. Corp. 348 U. S. 437, 444, 75 S. Ct. 489, 492, 99 L. ed. 510, 516, where in footnote 2 the United States Supreme Court said: "The Act expressly defers to state law on the question of legality of the union shop provision. (§§ 8(a) (3), 14(b).)"

impunity. However, to translate their conduct from an unprotected activity to an unfair labor practice one must find justification in the statute."

A strike in violation of a contract not open to renegotiation during its term is not an unfair labor practice under the National Labor Relations Act. It is declared to be such under M. S. A. 179.11(1). A number of state courts have held that under conditions such as we have here the state may entertain jurisdiction.[9]

Respondent union also contends that there has been a violation of the National Labor Relations Act, § 8(d),[10] which is an unfair labor

---

[9] See, General Bldg. Contractors' Assn. v. Local Union No. 542, 370 Pa. 73, 87 A. (2d) 250, 32 A. L. R. (2d) 822; Philadelphia Marine Trade Assn. v. International Longshoremen's Assn. 382 Pa. 326, 115 A. (2d) 733, certiorari denied, 350 U. S. 843, 76 S. Ct. 84, 100 L. ed. 751; General Elec. Co. v. International Union, 93 Ohio App. 139, 108 N. E. (2d) 211, appeal dismissed, 158 Ohio St. 555, 110 N. E. (2d) 424; Anchor Motor Freight N. Y. Corp. v. Local Union No. 445, 12 Misc. (2d) 757, 171 N. Y. S. (2d) 506, affirmed, 5 App. Div. (2d) 869, 171 N. Y. S. (2d) 511; McCarroll v. Los Angeles County Dist. Council of Carpenters, 49 Cal. (2d) 45, 315 P. (2d) 322, certiorari denied, 355 U. S. 932, 78 S. Ct. 413, 2 L. ed. (2d) 415.

[10] 61 Stat. 142, 29 USCA, § 158(d), provides:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

\*     \*     \*     \*     \*

practice under § 8(b)(2); hence, it argues, the National Labor Relations Board has exclusive jurisdiction over the controversy.

McLean contends that § 8(d) is applicable only to contracts subject to reopening or renegotiation during their term; hence, that it is not applicable here because this contract was not subject to reopening or renegotiation during its term.[11] Both parties rely on National Labor Relations Board v. Lion Oil Co. 352 U. S. 282, 77 S. Ct. 330, 1 L. ed. (2d) 331. A close reading of that decision will, we think, support McLean's contention in so far as it deals with our problem at all. The court said in that case (352 U. S. 285, 77 S. Ct. 332, 1 L. ed. [2d] 335):

"* * * The sole question presented by the petition for certiorari is: "Whether the requirement of this Section is satisfied *where a contract provides for negotiation and adoption of modifications at an intermediate date during its term,* and a strike in support of modification demands occurs after the date on which such modifications may become effective —and after the 60-day notice period has elapsed—but prior to the terminal date of the contract." (Italics supplied.)

It is obvious from that statement of the question presented that the case is of little help here, for this contract contains no provision for reopening, modification, or renegotiation until its expiration date. Some of the remarks of the court bear repeating here (352 U. S. 290, 77 S. Ct. 335, 1 L. ed. [2d] 338):

"* * * The use of the three words 'termination,' 'modification' and 'expiration' is significant. We conceive that a notice of desired modification would typically be served in advance of the date *when the contract by its own terms was subject to modification.* Notice of desired termina-

---

"(4) continues in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

"* * * and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract."

[11]See, 38 Minn. L. Rev. 886.

tion would ordinarily precede the date when the contract would come to an end by its terms or would be automatically renewed in the absence of notice to terminate." (Italics supplied.)

The court then quotes the latter part of § 8(d) quoted in the footnote above and says (352 U. S. 290, 77 S. Ct. 335, 1 L. ed. [2d] 338):

"The negative implication seems clear: Congress recognized a duty to bargain over modifications *when the contract itself contemplates such bargaining."* (Italics supplied.)

The court, although admitting that the 1948 committee report was no part of the legislative history of the 1947 act, quotes from such report the following (352 U. S. 291, 77 S. Ct. 335, 1 L. ed. [2d] 338):

"Reading section 8(d) as a whole seems to lead to the conclusion that *the act permits a strike, after a 60-day notice, in the middle of a contract which authorizes a reopening on wages.* Use of the words 'or modify' and 'or modification' in the proviso, and use of 'or modification' in section 8(d)(1), and the statement in the final paragraph of the section that the parties are not required to agree to any modification effective before the contract may be reopened under its terms, *all seem to contemplate the right of either party to insist on changes in the contract if they have so provided."* (Italics supplied.) S. Rep. No. 986, Pt. 3, 80th Cong. 2d Sess. p. 62.

Again, at 352 U. S. 293, 77 S. Ct. 336, 1 L. ed. (2d) 340, the court said:

"* * * Here the strike occurred at a time when the parties were bargaining over modifications *after notice and in accordance with the terms of the contract."* (Italics supplied.)

Mr. Justice Frankfurter, in his opinion concurring in part and dissenting in part, seems to agree with the interpretation of McLean as to the rule in the Lion Oil Co. case, in that he says (352 U. S. 296, 77 S. Ct. 338, 1 L. ed. [2d] 341):

"The reasoned efforts of the five members of the Board and the three Circuit Judges whose task it has been to apply this proviso to the problem before us—where an *economic strike occurs prior to the con-*

*tract's termination but pursuant to its reopening provisions and after sixty days' notice*—have produced four distinct interpretations of the Act." (Italics supplied.)

He also relies on a subsequent committee report which stated (352 U. S. 299, 77 S. Ct. 339, 1 L. ed. [2d] 343):

"In order that the parties may better know their rights in the matter, the committee recommends the adoption of the amendments *which would permit a strike or a lock-out after a 60-day notice in support of demands they have anticipated in a reopening clause.*" (Italics supplied.) S. Rep. No. 986, 80th Cong. 2d Sess. p. 63 (1948).

Mr. Justice Frankfurter concludes his opinion by saying (352 U. S. 303, 77 S. Ct. 341, 1 L. ed. [2d] 345):

*"As the Court's opinion holds, since the union struck more than sixty days after giving notice of its desire to amend and in the course of negotiations pursuant to the contract's reopening clause,* the Court of Appeals erred in setting aside the Board's order on the ground that the strike violated the waiting requirements of § 8(d)." (Italics supplied.)

It seems clear that the court dealt only with a contract which, *by its terms,* is subject to reopening or renegotiation prior to its expiration date. Inferentially, at least, it would seem that, if the contract contains no provision for reopening, it is not affected by § 8(d). The contract with McLean is specific on this question. It reads:

"Article XII.
*"Effective and Termination Dates*

"This Agreement shall take effect as of July 1, 1957 and shall continue in effect until June 30, 1959, inclusive. This Agreement may be reopened as of July 1, 1959 for changes or modifications herein, or termination hereof, by either party giving sixty (60) days advance written notice to the other of its intent to do so. If neither party reopens this contract as herein provided, it shall automatically be extended from year to year thereafter with like provisions for reopening as of the annual date of July 1."

Does the claim that the former Hamm's employees constitute a separate bargaining unit preclude the state court from exercising

jurisdiction?

It seems to us that before there can be any valid claim that one group of employees may constitute a separate bargaining unit there must be evidence of something which sets that group apart from other employees of the employer, either in the nature of the work they do or something else that distinguishes them from another group. In In re Breman, 93 N. L. R. B. 720, 721, the board said:

"For a group of employees to constitute an appropriate bargaining unit, such group must be at least a readily identifiable and homogeneous group apart from other employees. Because of the interchange here present, these elements are obviously lacking."

Here the record is conclusive that the individuals who were formerly employed by Hamm's, after being employed by McLean, did exactly the same work as those originally employed by McLean. They drove trucks containing mixed loads of various brands of beer, including Hamm's beer. They helped load and unload different brands of beer. Nothing appears from the record that could be said to in any way set them apart in a distinct group, except that they had formerly been employed by Hamm's. The mere fact that they had worked for a different employer is hardly sufficient to constitute them a separate group or bargaining unit.

Respondent union cites and relies on National Labor Relations Board v. Armato (7 Cir.) 199 F. (2d) 800, as being analogous to the factual situation we have here. In that case a business owned by one Krantz was sold for bona fide business reasons to Armato. The Krantz organization had a contract with a duly certified union representing the 25 employees of such employer. After transfer of the business, the new employer, Armato, employed 8 of the original Krantz employees. Armato knew of the existence of the collective-bargaining agreement between the employees and Krantz but refused to meet with the representative of the employees in bargaining for a contract. The National Labor Relations Board issued a cease-and-desist order, which was upheld by the Circuit Court of Appeals on the basis that a mere change in employers *did not operate to destroy the effectiveness of a certification of a union as the bargaining agent for the employees of*

*Krantz.* However, the case did not involve the question that we have involved here. There is no question in the case now before us as to representation. The same union represented the employees of Hamm's as represented the employees of McLean. That this union continues to be the bargaining agent for the employees now that they are employed by McLean is not disputed by anyone. As a result, the Armato case and cases of a similar nature are of no help here. The nature of the case is aptly illustrated by the following language of the court (199 F. [2d] 803):

"The crucial question presented is whether the certification of the union, issued by the Board during Krantz' ownership of the business, continued to be binding on Armato and the subsequently formed corporation. The very nature of a certification of a union as bargaining agent for a group of employees impels the conclusion that a mere change in employers does not operate to destroy the effectiveness of the certification. It is an official pronouncement by the Board that a majority of the employees in a given work unit desire that a particular organization represent them in their dealings with their employer. There is no reason to believe that the employees will change their attitude merely because the identity of their employer has changed."

But there is a more cogent reason here why the claim that they were entitled to be considered a separate bargaining unit is untenable.

In dealing with a contract between an employer and a union, acting as an exclusive bargaining agent for all employees of such employer, it is necessary to have in mind the nature of such agreement. To begin with, the union acts as the agent for the employees presently employed, and they are as much bound by the contract executed in their behalf by the union as if they had executed it themselves. Where, as here, the contract covers all employees in a designated category and gives to the employer the right to secure and hire new employees after the execution of the contract, such new employees, as they are hired, must be held to have accepted the terms of the contract under which they are employed so as to be bound by it as much as if they were so employed when the contract was executed. In other words, by accepting employment

under a contract, they adopt and ratify the terms thereof.[12] They cannot accept employment under the terms of an existing contract and at the same time secretly repudiate it.

Here, the evidence in the record before us is conclusive that the former employees of Hamm's accepted employment from McLean under the terms of the existing contract. The only evidence on this phase of the case to be found in the record is the testimony of McLean. He said:

"Q    What were the men told as you hired them?

\*    \*    \*    \*    \*

"A    I told the men that they were coming to work for the McLean Distributing Company under a contract that we had with Local 993, and that they were hired under the conditions of the contract existing between the McLean Distributing Company and the Local Union, and they agreed to that.

\*    \*    \*    \*    \*

"Q    Did you have response from any of these men with respect to these terms?

"A    Well, there was some question of some of the conditions, and they were informed what the rate was with our contract with the Union. I am under the impression that there was some different rating between the contract they formerly worked under, and the contract they came to work under.

"Q    Did you have a meeting with these new employees on the question of seniority?

"A    No.

"Q    Did you have any group of them together and discuss anything with them?

"A    Yes.

"Q    And when was that?

"A    Well, at the time they were applying for jobs.

"Q    And where was that?

"A    190 Chestnut in the office.

"Q    How many of these men that you hired were present at such a meeting?

---

[12]Anson v. Fisher Amusement Corp. 254 Minn. 93, 93 N. W. (2d) 815.

"A   I think there were at that particular time 22 or 24, right along in there.

"Q   Now did you talk to these men as a group?

"A   Yes, as a group.

"Q   What did you tell them?

\* \* \* \* \*

"A   These at the time I informed them that if they were hired they were coming to work under the existing contract between the McLean Distributing Co., and the union, and the question arose at that particular time what the rate was in our contract with the McLean Distributing Co., and I informed them to the best of my knowledge at that time I thought it was $2.80 an hour.

"Q   Was there any discussion of their seniority status?

"A   They were informed at that time that any that did come to work would follow in seniority line behind the men who were presently working at that time with the Distributing Company."

If this had not been true, we assume that respondent union would have attempted to show the contrary. It did not do so. It must follow that these employees either were hired under the terms of the existing contract or they were not hired at all. If they were hired under the contract, they were bound by it, and it must then follow that the strike was in violation of the terms of an express contract.

It is now claimed that McLean has lost the distribution of all products coming from without the state and is no longer engaged in interstate commerce. We have nothing in the record from which we may accept that contention as established fact. As a result, we must proceed on the basis of the stipulation entered into at the start of the case. It may well be that the issues involved in this decision have now become moot. On entertaining jurisdiction, the trial court will be in a position to delve into that matter. As the case now stands, McLean is entitled to a writ of mandamus commanding the trial court to accept jurisdiction and to proceed to trial and disposition of the case on its merits.

No attempt has been made in this opinion to review the many cases dealing generally with the extent to which a state court may go in granting relief in a case involving a labor controversy in the field of

interstate commerce. Instead, the decision is limited to the single question involved, namely, whether, *on the record before us,* the courts of this state may grant injunctive relief to restrain a strike in violation of a no-strike clause in a collective-bargaining contract which contains no provisions for reopening or negotiation prior to its expiration. We have not attempted to pass on the question of whether the state courts have concurrent jurisdiction under § 301 of the Labor Management Relations Act (29 USCA, § 185). As far as the record before us is concerned, we do not believe that the relief sought here is within the contemplation of § 301. Nor are we unmindful of the many difficulties inherent in a determination of whether a state court may act in a particular area of a controversy in such labor disputes. It would be impossible in an opinion of this kind to adequately discuss the whole subject. The complex nature of the questions involved in determining when and if a state court may act is apparent from any study of the many decisions on the subject. A comprehensive discussion of the problems involved, by Professor Bernard D. Meltzer of the University of Chicago Law School, may be found in Vol. 8, No. 1, of The Law School Record Special Supplement, p. 95, entitled "The Supreme Court, Congress and State Jurisdiction Over Labor Relations."

It might be added that, if the state court finds a violation of M. S. A. 179.11 and the court is not precluded from acting under the Federal Labor Management Relations Act, injunctive relief is available under § 179.14, in spite of § 185.02, the so-called "anti-injunction" act. By the express terms of § 179.14, the provisions of § 185.02 do not apply to violations of § 179.11 and other sections mentioned therein. However, the requirements of § 179.14 must be complied with before such injunctive relief may be granted.

Let the writ issue as prayed for.

THOMAS GALLAGHER, JUSTICE (concurring).

I agree that there are areas in labor-management relations in which the state courts retain jurisdiction. Whether the present controversy falls within such an area would seem to be dependent upon the trial court's determination of a number of facts and the conclusions to be drawn therefrom. As the trial develops, the evidence may establish

conclusively either that a controversy exists over which the National Labor Relations Board has exclusive jurisdiction; or that it falls within an area from which the state court has not been preempted.

MURPHY, JUSTICE (concurring).

I join in the concurring opinion of Mr. Justice Thomas Gallagher.