**NATIONAL LABOR RELATIONS BOARD
v. QUINCY STEEL CASTING CO., Inc.**

No. 4662.

United States Court of Appeals
First Circuit.

Dec. 8, 1952.

Rehearing Denied Dec. 29, 1952.

Robert E. Greene, Boston, Mass. (George J. Bott, General Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Assistant Gen. Counsel, Samuel M. Singer and Julian S. Perlman, all of Washington, D. C., on brief), for petitioner.

Julius Kirle, Boston, Mass., for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

This petition by the National Labor Relations Board seeks enforcement of a Board order predicated upon a finding that respondent, Quincy Steel Casting Co., Inc., has refused to bargain with the International Molders and Foundry Workers Union of North America, AFL, Local 106, the certified representative of its employees, in violation of § 8(a) (1) and (5) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 158(a) (1, 5). There is no doubt that respondent has refused to recognize and bargain with the Union. Respondent has consistently maintained the position that it is under no duty to do so, because the Union was improperly certified as the bargaining representative of its employees. As the case comes to us, the only question to be decided is whether the Board's finding that two of the company's employees, Francis W. Green and

John A. Dunn, were *not* supervisors within the meaning of § 2(11) of the Act, 29 U.S. C.A. § 152(11), and hence were entitled to vote in the election conducted by the Board, should be sustained as "supported by substantial evidence on the record considered as a whole". § 10(e), 29 U.S.C.A. § 160(e).

■ In a representation proceeding instituted by the Union, the Board, on December 18, 1950, issued its Decision and Direction of Election, finding that all the production and maintenance employees in respondent's plant in Quincy, Massachusetts, excluding office, clerical and professional employees, guards and supervisors, constituted a unit appropriate for collective bargaining, and directing that an election be conducted within thirty days among the employees of the unit, under the supervision of the Board's Regional Director. The company has at no time challenged the appropriateness of the unit as thus defined by the Board.

Thereafter, on January 17, 1951, the election was held. Prior thereto, in a letter to the Boston Regional Office of the Board, the attorney for respondent had supplied an "alphabetical list by departments of all the employees in the alleged appropriate unit appearing on the current payroll with their job titles." The list contained the names of 28 employees, including J. A. Dunn, described as "coremaker and bench pouring boss", and F. W. Green, described as "floor molder and assistant foreman".

During the course of the voting the company challenged the right of Green and Dunn to vote on the ground that they were supervisors and therefore excluded from the bargaining unit. In accordance with Board procedure, the agent conducting the election permitted Green and Dunn to vote, and duly impounded their challenged ballots. At the conclusion of the election, the agent issued a tally of ballots which showed that 27 employees had voted, out of 28 eligible voters, that 12 unchallenged ballots had been cast in favor of the Union, and 13 unchallenged ballots against it, with the two challenged ballots unopened and uncounted.

Since the challenged ballots were sufficient in number to affect the result of the election, the Regional Director, after investigation and in accordance with the Board's rules and regulations, issued his Report on Challenges on February 13, 1951, wherein he concluded that neither Green nor Dunn were "supervisors" and recommended that their ballots be opened and counted. Upon consideration of the company's exceptions to this report, the Board on March 26, 1951, issued its Supplemental Decision and Direction, in which it adopted the conclusions and recommendations of the Regional Director and ordered that the challenged ballots be opened and counted. Respondent promptly moved for reconsideration and for a formal hearing on the matter, but this request was denied by order of the Board issued April 10, 1951, "for lack of merit, and for the reasons set forth in the Supplemental Decision and Direction of March 26, 1951." Thereafter, the Regional Director opened and counted the challenged ballots and issued a revised tally, disclosing that of the 27 ballots cast, 14 were in favor of the Union and 13 against. Accordingly on April 26, 1951, the Regional Director, by authority of and on behalf of the Board, certified the Union as the exclusive bargaining representative of all the employees in the designated unit.

After the company had explicitly refused to recognize and bargain with the certified Union, the Union filed with the Board a charge of unfair labor practices, pursuant to § 10(b) of the Act. There followed a complaint against respondent, issued June 15, 1951, by the General Counsel of the Board.

The complaint came on for hearing before a Trial Examiner, at which hearing testimony was received at length as to the facts bearing on the issue whether Green and Dunn should have been included in the bargaining unit or excluded on the ground that they were "supervisors".

On July 31, 1951, the Trial Examiner issued his Intermediate Report and Recommended Order finding that the contested ballots had been properly counted, since Green and Dunn were not supervisors within the meaning of § 2(11) of the Act, finding further that respondent had refused to bargain with the certified Union, and recom-

mending that the Board issue an order against respondent in the usual terms.

Respondent filed exceptions to the Intermediate Report and a brief in support thereof. Upon consideration of the Intermediate Report, the exceptions, and brief, and the entire record of the case, the Board on December 3, 1951, issued its Decision and Order adopting the findings, conclusions, and recommendations of the Trial Examiner. This is the order which the Board seeks, in the pending petition, to have us enforce.

Section 2(3) excludes from the definition of the term "employee" "any individual employed as a supervisor". Section 2(11) defines "supervisor" as follows:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

"This section is to be interpreted in the disjunctive, and the possession of any one of the authorities listed in § 2(11) places the employee invested with this authority in the supervisory class." Ohio Power Co. v. NLRB, 6 Cir., 1949, 176 F.2d 385, 387, 11 A.L.R.2d 243. From a consideration of the record as a whole, we are satisfied that the Board was well warranted in concluding that, on the date of the election, neither Green nor Dunn was a supervisor within the meaning of § 2(11), and therefore that they were entitled to vote in the election for choice of employee representatives in the designated unit.

Green was employed as a molder, and the greater portion of his working time was spent as a regular production employee, making large molds. Up until January 17, 1951, the day of the election, he was paid at the rate of $1.80 per hour, the regular union scale for molders. After that date he received a raise of five cents per hour. Three or four times a day there would be occasion to pour hot metal from ladles into the molds. This pouring operation, which took from twenty minutes to half an hour, was initiated by the ringing of a bell by the superintendent, Mr. Towns. Green had charge of the immediate pouring operation, a task of coordination, telling a fellow molder when to start and when to stop pouring. While there was testimony that this pouring operation is difficult and dangerous and requires the exercise of some judgment, Green testified that any of the skilled molders in the room was competent to handle the job; and other workers also indicated that that operation is more or less routine.

In the foregoing respects Dunn's situation was similar to that of Green. Dunn was hired as a coremaker, a slightly more skilled position than that of molder, and he was paid $1.85 per hour, the union scale for coremakers. Dunn occupied the same position of leadership in the pouring operation for small molds which Green did for larger molds. His testimony as to the skill required in coordinating the pouring operation largely duplicated that of other witnesses. In addition, there was some testimony that Dunn was in charge of the core room, but it appeared that for years there had been no full-time employee working under him; and in answer to a question whether his supervising of the core room involved only supervising himself Dunn testified, "That's right, I am in full charge of myself." Like Green, Dunn regarded himself as one of the workers, rather than a supervisor for the management, and the other workers so regarded both of them.

■ Green and Dunn were both called as witnesses by respondent company, but upon the whole their testimony tends to support the position of the Board; from a reading of the transcript one gets the impression that each of them was endeavoring to testify fairly and candidly. Respondent also called as a witness the superintendent of the plant, Mr. Towns, who sought to build up the function of Green and Dunn in the coordination of the pouring operation as involving a high degree of independent judgment in the direction of the other molders

participating in pouring the hot metal into the molds. Towns proved to be a belligerent and evasive witness, and the Trial Examiner was not without justification in rejecting his testimony "except where it is corroborated by other witnesses, or is consistent with the facts as found herein." The Trial Examiner found "that the pouring operation is a routine matter and while, as in practically every type of manufacturing process, there is a safety factor involved, the duties performed by Green and Dunn in this connection are not of such character as render them supervisors but rather, at best, leadmen of the pouring crews." The legislative history of § 2(11) tends to support the Board's view that certain employees with minor supervisory duties, such as straw bosses and leadmen, were not intended to be excluded from the coverage of the Act. Sen. Rep. No. 105 on S. 1126, 80th Cong., 1st Sess., p. 4. See 93 Cong. Rec. 4677–4678.. See also NLRB v. Brown & Sharpe Mfg. Co., 1 Cir., 1948, 169 F.2d 331, 1950, 183 F.2d 259. In this connection, the reliance by respondent on Ohio Power Co. v. NLRB, 6 Cir., 1949, 176 F.2d 385, 11 A.LR. 2d 243, is misplaced, for the "control operator" of a highly mechanized steam electric generating plant, who was there held to be a supervisor, had sole responsibility for the maintenance and operation of the entire plant, with the details handled by two assistants acting under his general direction.

■ As to Green, respondent in addition stresses the fact that from the time Green was employed in the plant, and continuing right up to the day of the election, it was part of his job to take over as acting superintendent when Towns was absent from the plant, which included the period of one week a year when the superintendent was off on his annual vacation, and also on irregular occasions when Towns happened to be absent from the shop, estimated as averaging about eight hours a month. On those infrequent occasions, it appears that Green had authority to assign work as well as to recommend hirings and discharges; but only once or twice did he undertake to discipline fellow employees, while thus acting in Towns' stead. The only additional pay which Green received above and beyond the regular union scale for molders was a bonus of $15 or $20 paid him for the week Towns was off on vacation. The Board has held, we think correctly, that such spasmodic and infrequent assumption of a position of command and responsibility does not transform an otherwise rank-and-file worker into a "supervisor". Great Northern Icing Co., 73 N.L.R.B. 116 (1947). It is true, as respondent urges, that there are cases which indicate that the frequency or infrequency of the actual exercise of supervisory powers is irrelevant. Ohio Power Co. v. NLRB, 6 Cir., 1949, 176 F.2d 385. However, that case, and cases like it, go no further than to hold that the mere fact that a full-time supervisor does not often exercise his authority (e. g., by hiring or firing employees) does not of itself negative his supervisory status. But the present case presents a different situation, where a regular production employee, during a small percentage of his working time, takes over supervisory duties when the supervisor is occasionally absent.

■ One further point is urged by respondent as establishing the status of Green as supervisor. On the morning of the election, January 17, 1951, Green was called into the office and told by respondent's president and by Superintendent Towns that they were making him "Assistant Superintendent" of the plant, with a pay raise of five cents per hour, retroactive to January 1. Cf. Cherokee Brick & Tile Co., 100 N.L.R. B. No. 100 (Aug. 19, 1952), where the Board commented that "the timing of the alleged delegation of supervisory authority compels us to scrutinize closely the surrounding factors to determine whether or not supervisory authority was in fact delegated to the employees concerned." Respondent does not appear to have given its employees any formal notification of Green's promotion to a supervisory status. Of course, the important thing is the actual duties and authority of the employee, not his formal title. See Red Star Express Lines of Auburn, Inc. v. NLRB, 2 Cir., 1952, 196 F.2d 78. Some of Green's fellow employees testified that they did not know of Green's "promotion" until some time after the election. Green himself stated that his duties

did not change after January 17, 1951, adding, and this seems to be undisputed, that he continued his work as a molder. Another fellow molder, Chatkowski, testified that some weeks after January 17 he took over Green's job of handling the "bull ladle", or the "big ladle", in the coordination of the pouring operation; and the Trial Examiner found that some time after the election "Green assumed duties in respect to the pouring of metal as previously exercised by Towns." It may be that Green then took on duties of a truly supervisory character, within the meaning of § 2(11) of the Act— the record is somewhat vague and inconclusive on this point. But as we have held above, the Board was warranted in finding that, prior to January 17; 1951, Green did not occupy the status of a supervisory employee; and we conclude, on the whole record, that the Board was also reasonable in finding that when the balloting took place on January 17, 1951, Green's status had not yet been transformed into that of a supervisor, whatever may have become his status at a later date. His eligibility to vote was to be determined by the situation as it existed on the day of the election.

A decree will be entered enforcing the order of the Board.