INTERLAKE STEAMSHIP COMPANY AND ANOTHER
v. MARINE ENGINEERS BENEFICIAL ASSOCIATION
AND OTHERS.*

108 N. W. (2d) 627.

March 30, 1961—No. 38,110.

*Certified to United States Supreme Court June 5, 1961.

2

*Lewis, Hammer, Heaney, Weyl & Halverson* and *Lee Pressman,* for appellants.

*Nye, Sullivan, McMillan, Hanft & Hastings, Charles D. Johnson,* and *Baker, Hostetler & Patterson,* for respondents.

KNUTSON, JUSTICE.

This is an appeal from an order of the district court granting a permanent injunction restraining defendants from picketing under the facts of this case.

Plaintiffs, Interlake Steamship Company and Pickands-Mather & Company, are the owners and operators of the second largest bulk cargo fleet of ships on the Great Lakes. For the most part, their ships transport bulk cargoes of coal and iron ore between Great Lakes ports in the United States and Canada.

Defendant Marine Engineers Beneficial Association, Local 101, referred to hereinafter as MEBA, is a voluntary unincorporated association which admits to membership licensed engineers employed on commercial vessels on the Great Lakes and the oceans.

Defendant Charles LaPorte is an agent and business representative of MEBA. His duties include the direction of the activities of MEBA in Duluth, Minnesota.

On November 11, 1959, Interlake's vessel, *Samuel Mather,* arrived at the dock of the Carnegie Dock & Fuel Company at Duluth, Minnesota, to unload a cargo of coal. The unloading of the vessel by the employees of Carnegie Dock & Fuel Company commenced shortly after the ship had docked. In the normal course of events the ship would have been unloaded in about 34 hours.

Early in the morning of November 12, 1959, five or six men began picketing the single private road entrance to the dock, walking in a tight circle across the road. Some of the men carried signs which read:

"Pickands-Mather Unfair To Organized Labor
This Dispute Only Involves Pickands-Mather M.E.B.A.
Loc. 101 A.F.L.-C.I.O."

Others carried signs which read:

"M.E.B.A. Loc. 101 AFL-CIO Requests
P. M. Engineers To Join with Organized Labor
to Better Working Conditions
This Dispute Only Involves Pickands-Mather"

After the picketing of this road began, dockworkers employed by Carnegie Dock & Fuel Company refused to proceed with the unloading of the vessel. Later the same day, the District Court of St. Louis County issued a temporary restraining order prohibiting such picketing, but the dockworkers still refused to unload the cargo. As a further result of the picketing, certain independent truckdrivers refused to enter the premises and take delivery of coal for 2 hours.

Defendant Charles LaPorte, who identified himself on November 12, 1959, as business agent of MEBA, Local 101, stated that it was the intention of the union to picket all Pickands-Mather ships coming into the harbor.

On November 15, 1959, while the *Samuel Mather* remained partially unloaded at the dock, Interlake's vessel, *Pickands,* arrived in the Duluth harbor with another load of coal destined for unloading at the same dock. Since the dock could handle only one ship at a time, the *Pickands* had to remain anchored in the harbor for a number of days.

On the night of November 12, 1959, four or five pickets with signs identifying them with MEBA appeared at the entrance to the Duluth plant of the Interlake Iron Corporation and moved around continuously across the plant entrance. At that time there was no dispute between Interlake Iron Corporation and its employees, and none of its employees were on the picket line.

Each Interlake vessel has a chief engineer and three assistant engineers, all of whom are licensed by the coast guard. Plaintiffs' evidence sought to show that all Interlake engineers and assistant engineers are supervisory employees. Defendants introduced no evidence

on this point but admitted that all of the engineers and assistant engineers aboard the *Mather* were supervisors.

Plaintiffs had no dispute of any kind with the employees on the Interlake fleet at the time of the picketing, and prior to the picketing there had never been any negotiations between plaintiffs and defendants nor had defendants ever made any request of the plaintiffs for leave to board their ships. Interlake had an established policy to prohibit any unauthorized person from boarding its ships. Request had never been made of any Interlake official for permission to board such ships, but the right to do so was refused by the person who was on watch at the ship at the time in accordance with the rules of Interlake forbidding any unauthorized person to go aboard.

Plaintiffs' representatives and Interlake's chief executive officers knew of no MEBA members in the fleet. Defendants claim that it did have some such engineers as members but refused to disclose the names thereof. The trial court found that all of the engineers and assistant engineers employed on plaintiffs' vessels are supervisors within the meaning of the National Labor Relations Act.

Picketing which prevented the unloading of the vessels caused financial loss to plaintiffs amounting to about $6,000 per day, not including any profit.

A hearing was held on November 18, 1959, after which a temporary injunction was granted, and a permanent injunction was subsequently ordered on March 28, 1960.

It is the contention of defendants (1) that the state court lacks jurisdiction over the subject matter of the action; and (2) that if the state court does have jurisdiction the injunction should nevertheless have been denied.

■ Defendants first contend that the state court lacks jurisdiction to enjoin picketing for organizational or recognition purposes but that such jurisdiction rests exclusively with the National Labor Relations Board. To support this contention, they rely on Norris Grain Co. v. Seafarers' International Union, 232 Minn. 91, 46 N. W. (2d) 94, and Faribault Daily News, Inc. v. International Typog. Union, 236 Minn. 303, 53 N. W. (2d) 36; Annotation, 32 A. L. R. (2d) 1026.

Under the original Federal Labor Management Relations Act of 1935 the contention of defendants no doubt would be sound. Packard Motor Car Co. v. National Labor Relations Board, 330 U. S. 485, 67 S. Ct. 789, 91 L. ed. 1040. The Federal act, however, was amended in 1947 by the so-called Taft-Hartley Act, and the amendments brought about at that time are of great importance in this case. As so amended, the law is found in 29 USCA, § 152(3), 61 Stat. 137, and, as far as pertinent here, reads:

"The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this sub-chapter explicitly states otherwise, * * * *but shall not include* * * * *any individual employed as a supervisor,* * * *.*" (Italics supplied.)

29 USCA, § 152(11), 61 Stat. 138, reads:

"The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

29 USCA, § 164(a), 61 Stat. 151, reads:

"Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining."

29 USCA, § 157, 61 Stat. 140, defines the right of employees to organize and reads:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid

or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."

The trial court found that the engineers employed by plaintiffs were supervisors within the meaning of the above Federal provisions. That finding has ample support in the record and is not, we believe, seriously disputed by defendants.

Defendants argue, however, that it has now been determined in National Marine Engineers Beneficial Assn. v. National Labor Relations Board (2 Cir.) 274 F. (2d) 167, that MEBA is a labor organization subject to the secondary boycott provisions of the Federal act and that, inasmuch as the complaint in this case alleges a violation of the secondary boycott provisions of both state and Federal laws, it follows that the National Labor Relations Board has exclusive jurisdiction under our decision in Norris Grain Co. v. Seafarers' International Union, *supra*. This contention is untenable for at least two reasons. In the first place, the Federal court did not hold that MEBA is a labor organization under the evidence in this case. Decision in that case was based squarely on the facts there involved. To make this clear, the court said (274 F. [2d] 175):

"* * * The Board [National Labor Relations Board] could properly have thought that the matters placed in the record by the general counsel justified an inference that non-supervisors do participate in MEBA and MMP, and that this sufficed for the Board's finding to that effect unless they were rebutted by more convincing evidence than the unions offered here. We therefore cannot say the Board's finding that MEBA and MMP were labor organizations did not meet the standards laid down in Universal Camera Corp. v. N. L. R. B., 1951, 340 U. S. 474, 71 S. Ct. 456, 95 L. Ed. 456. *We are not saying that MEBA and MMP are or are not in fact 'labor organizations' within the meaning of § 8(b) today. We say only that we cannot hold, on the evidence in this record, that the Board was unjustified in finding that they were in April, 1957.* We do not look with favor

on the practice of determining such an issue by the citation of previous Board proceedings rather than by an investigation of the facts." (Italics supplied.)

Secondly, Norris Grain Co. v. Seafarers' International Union, *supra,* had nothing to do with supervisory employees who are expressly excluded by the Taft-Hartley amendment to the Federal labor act.

We fully realize that in determining whether a state court has jurisdiction over any phase of labor relations involving interstate commerce we are treading in a no man's land where the boundaries are frequently obscure,[1] but it seems to us that, when Congress expressly excluded supervisory employees from the Federal act and left it clearly up to management to determine whether it would recognize and deal with the union as a bargaining agent for such employees, it left this field open to state regulation.[2] Any other conclusion would lead to the result that labor practices in this area would be subject to no regulation at all. We are convinced that here the state court had jurisdiction. The same result was reached by the California court in Safeway Stores, Inc. v. Retail Clerks International Assn. 41 Cal. (2d) 567, 261 P. (2d) 721, and In re Kelleher, 40 Cal. (2d) 424, 254 P. (2d) 572; and by the New York court in 260 Madison Avenue Corp. v. Nelson, 284 App. Div. 254, 131 N. Y. S. (2d) 426.

■ We then come to the more difficult question as to whether plaintiffs were entitled to an injunction under our state law. Crucial to a determination of this question are the following findings of the court:

"15. The * * * purpose and objective of the picketing and activities of MEBA Local 101, hereinabove described is to secure from plaintiffs the same type of agreement or understanding which it has obtained from other employers operating bulk cargo vessels on the

---

[1]See, Labor Relations Law, 1959 Annual Survey of American Law, New York University School of Law, p. 145.

[2]See, McLean Distributing Co. Inc. v. Brewery & Beverage Drivers, 254 Minn. 204, 94 N. W. (2d) 514, certiorari denied, 360 U. S. 917, 79 S. Ct. 1436, 3 L. ed. (2d) 1534.

Great Lakes. Every agreement or understanding between said defendant and other Great Lakes vessel companies includes a provision requiring every licensed engineer hired after a specified date to become a member of said defendant organization within thirty days from the date of his employment as a condition of continued employment.

"16. The further purpose and objective of defendants' picketing and activities as described above was to coerce and induce plaintiffs to force, compel or induce engineers employed on Interlake vessels to become members of MEBA Local 101 and was for the purpose of injuring plaintiffs in their business because of their refusal to in any way interfere with the rights of engineers employed on Interlake vessels to join or not to join said defendant organization.

"17. The further purpose and objective of defendants' picketing and activities as described above was to coerce and intimidate plaintiffs in order to secure recognition from plaintiffs of MEBA Local 101 as the collective bargaining agent for the licensed engineers employed on Interlake vessels."

It is the contention of defendants that these findings are not supported by the evidence; that the only purpose of picketing was to obtain leave to board plaintiffs' vessels so that agents of MEBA could talk to the engineers and attempt to induce them to become members of the union; and that a further purpose was to procure an election to be conducted by some impartial group to ascertain whether the engineers wished to have MEBA represent them as collective bargaining agents. It is conceded by all that the National Labor Relations Board would not conduct such election.

The stipulation of defendants' counsel as to the purpose of the picketing is somewhat revealing. He said:

"The Marine Engineers Beneficial Association is prepared to stipulate * * * that the purpose of picketing * * * the plaintiff in this case— was to improve the wages, hours and working conditions of the licensed engineers of the plaintiff company as well as the wages, hours and working conditions of the licensed engineers of other companies on the Great Lakes and on the high seas; and that, more specifically, its purpose was to secure—well strike that. And that in furtherance of

this policy that its purpose was to obtain from the defendant the type of agreement or understanding that it has obtained from other companies on the Great Lakes under similar circumstances; the type of understanding that has been obtained elsewhere, and that the defendant Marine Engineers Beneficial Association would feel appropriate in this case and would feel would serve the purpose of improving the wages, hours and working conditions of the engineers which is, number 1: That representatives of the Marine Engineers Beneficial Association be given permission to go aboard the vessels * * * of the plaintiff * * * at such reasonable times and places as may be agreed to between the parties, and secondly: to secure an understanding from the company that on request from the Marine Engineers Beneficial Association, within such reasonable time as may be established by the parties and on such a showing as may be agreed to by the parties, that the plaintiff would agree that an election could be held among the licensed engineers of the company for the purpose of determining whether or not the employees voluntarily and freely, of their own will, in a secret ballot desire to be represented by this association with the understanding being, of course, that if such an election is held and if the employees indicate that they do not desire to be represented by the Marine Engineers Beneficial Association that no further efforts would be made in this action for such reasonable period of time as might be agreed to between the parties."

The signs carried by the pickets also are significant in establishing the ultimate objective of the picketing.

The record discloses, without dispute, that the type of contract which MEBA desired to obtain contained a union security clause requiring all engineers at some time in the future to become members of the union.

In determining what the ultimate purpose of the picketing was, the court was justified in drawing reasonable inferences from the evidence. After all, courts need not be oblivious to facts which are apparent to all others. Here, no dispute existed between plaintiffs and their employees. None of plaintiffs' employees took part in the picketing, but the pickets were entirely agents of MEBA, some of whom came from places far removed from the scene of the activity. It is conceded that

MEBA did not represent such employees although it is claimed that a few of the engineers did belong to MEBA. No request had been made of anyone having authority to grant it on behalf of plaintiffs for leave to board their ships or to have an election, which defendants claim was the sole purpose of the picketing. The pickets simply appeared on the scene like ghosts in the night and effectively and immediately tied up the unloading of plaintiffs' ships due to the fact that the employees of Carnegie Dock & Fuel Company refused to work on the ships as long as the pickets remained there. It is apparent that the ultimate object of MEBA was to procure a contract having a union security clause in it which would require engineers in the future to become members of the union. We think that the court had ample justification in finding, as it did, that the purpose of the picketing was to coerce or compel plaintiffs to accept a contract having in it a union security clause.

■ Under the Minnesota Labor Relations Act, supervisors are not excluded as they are under the Federal act, although Minn. St. 179.16 places them in a separate category in that they cannot vote in the selection of a bargaining agent.

Section 179.10 contains a declaration of public policy adopted by our legislature with respect to rights of employees. Subd. 1 thereof reads:

"Employees shall have the right of self-organization and the right to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection; and such employees shall have the right to refrain from any and all such activities."

In 1947, our legislature added § 179.42, which reads:

"It is an unlawful act and an unfair labor practice for any person or organization to combine with another, to cause loss or injury to an employer, to refuse to handle or work on particular goods or equipment or perform services for an employer, or to withhold patronage, or to induce, or to attempt to induce, another to withhold patronage or other business intercourse, for the purpose of inducing or coercing

such employer to persuade or otherwise encourage or discourage his employees to join or to refrain from joining any labor union or organization or for the purpose of coercing such employer's employees to join or refrain from joining any labor union or organization."

Section 179.12, as far as here material, reads:

"It shall be an unfair labor practice for an employer:

\* \* \* \* \*

"(3) To encourage or discourage membership in any labor organization by discrimination in regard to hire or tenure of employment or any terms or conditions of employment; provided, that this clause shall not apply to the provisions of collective bargaining agreements entered into voluntarily by an employer and his employees or a labor organization representing the employees as a bargaining agent, as provided by section 179.16."

Thus, under § 179.12(3), it is an unfair labor practice for employers to enter into agreements containing union security clauses unless such provisions are contained in agreements entered into voluntarily by an employer and his employees or a labor-organization representative as a collective bargaining agent as provided by § 179.16.

In The Dayton Co. v. Carpet, Linoleum, etc., Union, 229 Minn. 87, 39 N. W. (2d) 183, appeal dismissed, 339 U. S. 906, 70 S. Ct. 570, 94 L. ed. 1334, we held that it was an unlawful practice for an employer to coerce employees into belonging to a union unless done in accordance with § 179.12. We held that this section relates solely to unfair labor practices by employers. We left open the question of whether or not acts done by a labor organization seeking to compel an employer to violate § 179.12(3) may also be enjoined. Inasmuch as we now uphold the trial court's finding that the picketing in this case was conducted for the purpose of coercing the employer to enter into a contract containing a union security clause contrary to § 179.12(3), the question we left open in the The Dayton Company case is squarely before us. To hold that for an employer to coerce or compel his employees to become members of a union against their will is an unfair labor practice which may be enjoined but that a union is

free to bring economic pressure on such employer to do that which the law prohibits him from doing would place an employer in an unenviable position indeed. He could then refuse compliance with the union's demands, as the law would require him to do, and suffer a possible destruction of his business or, at the very least, serious economic loss, or he could comply with the union's demands and be held guilty of having committed an unfair labor practice under the law. In this sensitive area of balancing rights of labor and management in the field of labor relations, we do not believe that we need give the statutes of this state a construction which will lead to such an unfair and absurd result.

Many of the arguments advanced here were considered by the Indiana court in Roth v. Local Union No. 1460 of Retail Clerks Union, 216 Ind. 363, 24 N. E. (2d) 280. Indiana has an anti-injunction statute quite similar to our c. 185. The Indiana statute contains a declaration of public policy quite similar to that found in our statutes. In holding that picketing by a union to compel an employer to enter into a closed-shop agreement could be enjoined, the Indiana court said (216 Ind. 370, 24 N. E. [2d] 282):

"* * * The statute here under consideration declares that it is the public policy of this state that the individual unorganized worker shall be free to decline to associate with his fellows and that he shall be free from interference, restraint, or coercion on the part of his employer. This must mean that no labor union may demand that an employer require his employee to join such union, because no employer has the right to require an employee to join or refrain from joining a labor union. *Any person or group which undertakes to coerce an employer to do that which is contrary to the express public policy of this state thereby undertakes to compel the performance of an unlawful act. The lawful weapon of peaceful picketing may not be utilized to accomplish such an unlawful purpose.* It is quite immaterial that the things done to bring about the unlawful purpose were not *per se* unlawful." (Italics supplied.)

In Gazzam v. Building Service etc. Union, 29 Wash. (2d) 488,

500, 188 P. (2d) 97, 103, 11 A. L. R. (2d) 1330, 1337,[3] the Washington court, following the Indiana court, said:

"We hold that the acts of respondents, in so far as the picketing was concerned, were coercive—first, because they violated the provisions of Rem. Rev. Stat. (Sup.) § 7612-2, and, second, because they were in violation of the rules of common law as announced in the cases just approved."

On appeal to the United States Supreme Court, Building Service etc. Union v. Gazzam, 339 U. S. 532, 538, 70 S. Ct. 784, 788, 94 L. ed. 1045, 1051, the court said:

"* * * Picketing of an employer to compel him to coerce his employees' choice of a bargaining representative is an attempt to induce a transgression of this policy, and the State here restrained the advocates of such transgression from further action with like aim. To judge the wisdom of such policy is not for us; ours is but to determine whether a restraint of picketing in reliance on the policy is an unwarranted encroachment upon rights protected from state abridgment by the Fourteenth Amendment."

Maine also has a statute quite similar to ours. In Pappas v. Stacey, 151 Me. 36, 41, 116 A. (2d) 497, 499, appeal dismissed, 350 U. S. 870, 76 S. Ct. 117, 100 L. ed. 770, the Maine court said:

"Under the statute enacted in P. L., 1941, c. 292, *supra,* the employee, or worker, is protected from 'interference, restraint or coercion by their employers or other persons * * *.' The worker must be left free from interference by employer or other persons in reaching a decision whether to join or refrain from joining a union. It follows necessarily that pressure cannot lawfully be directed against the employer to force him to interfere with the free choice of his employees. The plaintiff cannot lawfully be placed in a position where compliance with the strikers' demands requires action in violation of the law of the State."

---

[3]For the second decision in this case, see Id. 34 Wash. (2d) 38, 207 P. (2d) 699, affirmed, 339 U. S. 532, 70 S. Ct. 784, 94 L. ed. 1045.

International Brotherhood of Teamsters v. Vogt, Inc. 354 U. S. 284, 77 S. Ct. 1166, 1 L. ed. (2d) 1347, contains a comprehensive review of the decisions of the United States Supreme Court on this subject. The United States Supreme Court affirmed a decision of the Wisconsin court, Vogt, Inc. v. International Brotherhood of Teamsters, 270 Wis. 315, 321g, 74 N. W. (2d) 749, 753, where the Wisconsin court said:

"* * * Picketing may be more than free speech. When it is conducted, as it was in this instance, upon a rural highway at the entrance to a gravel pit where an exceedingly small number of possible or probable patrons of the owner's business might pass and be influenced by the union's banner, it is more than the mere exercise of the right of free communication. One would be credulous, indeed, to believe under the circumstances that the union had no thought of coercing the employer to interfere with its employees in their right to join or refuse to join the defendant union. We have not the slightest doubt that it was the hope of the union that the presence of pickets at plaintiff's place of business would interfere with its operation and deprive it of delivery service, thus bringing pressure upon it to coerce its employees to join the union."

In affirming the decision of the Wisconsin court, the United States Supreme Court said (354 U. S. 294, 77 S. Ct. 1171, 1 L. ed. [2d] 1354):

"The Stacey case [Pappas v. Stacey, supra] is this case. * * * As in Stacey, the highest state court drew the inference from the facts that the picketing was to coerce the employer to put pressure on his employees to join the union, in violation of the declared policy of the State. (For a declaration of similar congressional policy, see § 8 of the National Labor Relations Act, 61 Stat. 140, 29 U. S. C. § 158.) The cases discussed above all hold that, consistent with the Fourteenth Amendment, a State may enjoin such conduct."

Many other cases could be discussed, but we think that it is now evident that picketing, even though peacefully conducted, may go beyond the legitimate exercise of the right of free speech; that when its

ultimate purpose is to coerce or compel an employer to commit an unlawful act the picketing itself becomes unlawful and may be enjoined; and that in finding what is the purpose of picketing the court may look through a veil of legitimacy and determine what the picketing is intended to accomplish. In so doing, the trial court is permitted to draw reasonable inferences from the evidence the same as in any other field of litigation, and, when findings are based on inferences so drawn, they must stand if there is reasonable support for them in the record. Here, the court's finding that the purpose of the picketing was to compel or coerce the employer into committing an unfair labor practice under our law finds ample support in the record. That being true, the picketing itself becomes unlawful.

■ There remains then only the question of whether the injunction is prohibited by our Minnesota Anti-Injunction Act, Minn. St. c. 185. The public policy of this state is declared in § 185.08, and in the application of the so-called Anti-Injunction Act the legislature has specifically stated that interpretation should be based upon such public policy. As so declared, it reads as far as material here:

"Whereas, under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the state, are hereby enacted."

Obviously, the act was passed for the purpose of protecting the

right of employees to have freedom of choice in the selection of their bargaining agent and was not intended for the purpose of permitting the commission of unlawful acts. We do not believe that the act here enjoined comes within the category of those things which are protected by the act. See, for instance, the acts specified in § 185.10.

We have considered all other contentions of the parties, as well as authorities cited, but see no need of further extending this opinion. We are convinced that the trial court properly enjoined the conduct complained of.

Affirmed.

MR. JUSTICE OTIS, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.