MARINE ENGINEERS BENEFICIAL ASSO-
CIATION ET AL. *v.* INTERLAKE
STEAMSHIP CO. ET AL.

No. 166.   Argued April 16, 1962.—Decided June 11, 1962.

*Lee Pressman* argued the cause for petitioners. With him on the briefs was *Richard H. Markowitz.*

*Raymond T. Jackson* argued the cause for respondents. With him on the briefs was *James P. Garner.*

MR. JUSTICE STEWART delivered the opinion of the Court.

In *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, this Court held that the proper administration of the federal labor law requires state courts to relinquish jurisdiction not only over those controversies actually found to be within the jurisdiction of the National Labor Relations Board, but also over litigation arising from activities which might arguably be subject to that agency's cognizance. Only such a rule, the Court held, will preserve for the Labor Board its congressionally delegated function of deciding what is and what is not within its domain.[1] In the present case the Supreme Court of Minnesota held that the petitioners, Marine Engineers Beneficial Association (MEBA) and its Local 101, were not "labor organizations" within the meaning of § 8 (b) of the Labor Management Relations Act, 29 U. S. C. § 158 (b), and therefore not subject to the unfair labor practice provisions of that section of the statute. Accordingly, the court held that a state trial court had not erred in assuming jurisdiction over a labor dispute involving MEBA and Local 101, and in permanently enjoining them

---

[1] "At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board." 359 U. S., at 244–245.

from picketing found to be in violation of state law. 260 Minn. 1, 108 N. W. 2d 627. We granted certiorari, 368 U. S. 811, to consider an asserted conflict between the Minnesota court's decision and our holding in the *Garmon* case.

The essential facts which gave rise to this controversy are not in dispute. The respondents owned and operated a fleet of bulk cargo vessels on the Great Lakes. MEBA and Local 101 were unions which represented marine engineers employed on the Great Lakes and elsewhere.[2] The marine engineers employed by the respondents were not represented by MEBA or any other union.

On November 11, 1959, the respondents' vessel, *Samuel Mather,* arrived at the dock of the Carnegie Dock and Fuel Company in Duluth, Minnesota. The following morning several members of Local 101 began to picket at the only entrance road to the Carnegie dock. They carried signs which read: "Pickands Mather Unfair to Organized Labor. This Dispute Only Involves P–M. M. E. B. A. Loc. 101 AFL–CIO." and "M. E. B. A. Loc. 101. AFL–CIO. Request P–M Engineers to Join with Organized Labor to Better Working Conditions. This Dispute Only Involves P–M." When the pickets appeared, employees of the Carnegie Dock and Fuel Company refused to continue unloading the *Samuel Mather.* As a result, the ship was forced to remain at the dock, and another of the respondents' steamers, the *Pickands,* was compelled to ride at anchor outside the harbor for a number of days, because the Carnegie dock could accommodate but one vessel at a time.

---

[2] The record shows that Local 101 was hardly a "local" in the conventional sense of that term. It had branch offices not only throughout the Great Lakes area, but also in Brooklyn, San Francisco, and Houston, among other places, and there were "approximately 35 to 40 locals in 101; some are very small, some are very large."

Upon learning of the picket line, the respondents filed a complaint in the state court charging the union with several violations of state law. The complaint alleged, among other things, that the petitioners had induced Carnegie's employees to refuse to perform services, and that the petitioners had thus caused Carnegie to breach its contract with the respondents. The petitioners filed a motion to dismiss the complaint, claiming that the dispute was arguably subject to the jurisdiction of the National Labor Relations Board and thus, under the *Garmon* doctrine, beyond the state court's cognizance.[3] Evidence was taken concerning the nature and effect of the picketing, the employment status of respondents' marine engineers, and, to a limited extent, the characteristics of MEBA and Local 101. The trial court concluded that the dispute was within its jurisdiction, and, finding the picketing to be in violation of Minnesota law, it issued a temporary injunction prohibiting the petitioners from picketing at or near any site where the respondents' vessels were loading or unloading, from inducing other employees or other firms not to perform services for the respondents, and from interfering in other specified ways with the respondents' operations. The injunction was later made permanent on the basis of the same record, and the court's judgment was affirmed on review by the Supreme Court of Minnesota.

The *Garmon* case dealt with rules of conduct—whether certain activities were protected by § 7 or prohibited by § 8 of the Act. In the present case it has hardly been disputed, nor could it be, that the petitioners' conduct was of a kind arguably prohibited by § 8 (b)(4)(A) of the Act and thus within the primary jurisdiction of the Board, if MEBA and Local 101 were "labor organizations"

---

[3] Potential NLRB jurisdiction under § 8 (b) is the only basis upon which the petitioners have claimed preemption of state court jurisdiction. See note 4, *infra*.

within the contemplation of § 8 (b) generally.[4] The Minnesota courts determined, however, that those whom the petitioners represented and sought to enlist were "supervisors," that consequently neither of the petitioners was a "labor organization," and therefore that nothing in the *Garmon* doctrine precluded a state court from assuming jurisdiction.

It is the petitioners' contention that the issue to be determined in this case is not whether the state courts correctly decided their "labor organization" status, but whether the state courts were free to finally decide that issue at all. The petitioners contend that the principles of the *Garmon* decision confined the state court to deciding

---

[4] On November 12, 1959, the day the picketing began, § 8 (b) (4) (A) provided as follows:

"It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . ." 29 U. S. C. § 158 (b) (4) (A).

Shortly thereafter the amendments made by the Labor-Management Reporting and Disclosure Act became effective, and § 8 (b) (4) (A) became § 8 (b) (4) (B), 29 U. S. C. (Supp. II) § 158 (b) (4) (B). The here-pertinent language of the amended sections remained virtually the same.

We express no opinion on the ultimate applicability of these provisions. Compare *Sailors' Union of the Pacific (Moore Dry Dock Co.)*, 92 N. L. R. B. 547, with *National Maritime Union (Standard Oil Co.)*, 121 N. L. R. B. 208, enforced, 274 F. 2d 167. See generally, *Local 761, Electrical Workers* v. *Labor Board*, 366 U. S. 667.

only whether the evidence in this case was sufficient to show that either of them was arguably a "labor organization" within the contemplation of § 8 (b). We agree, and hold that the evidence was sufficient to deprive the Minnesota courts of jurisdiction over this controversy.

We see no reason to assume that the task of interpreting and applying the statutory definition of a "labor organization" does not call for the same adjudicatory expertise that the Board must bring to bear when it determines the applicability of §§ 7 and 8 of the Act to substantive conduct. Indeed, analysis of the problem makes clear that the process of defining the term "labor organization" is one which may often require the full range of Board competence.

The term "labor organization" is defined by § 2 (5) of the Act, which says:

> "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U. S. C. § 152 (5).

The part of that definition at issue in the present case is the requirement that "employees participate" in the organization. As defined by § 2 (3) of the Act, "[t]he term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . ." 29 U. S. C. § 152 (3).[5] "Supervisor" is defined in turn by § 2 (11) of the Act to mean:

> ". . . any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off,

---

[5] The decision of Congress to forego regulation of labor relations between employers and their supervisory personnel was the product

recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U. S. C. § 152 (11).

The statutory definition of the term "supervisor" has been the subject of considerable litigation before the NLRB and in the federal courts.[6] It is immediately apparent, moreover, that the phrase "organization . . . in which employees participate" is far from self-explanatory. Several recurring questions stem from the fact that na-

---

of experience under the National Labor Relations Act of 1935. The Board's assumption of jurisdiction over supervisors under the 1935 Act was approved by this Court in *Packard Motor Car Co.* v. *Labor Board,* 330 U. S. 485. Congress passed the 1947 Act shortly thereafter, explicitly stating its purpose to free employers from compulsion to treat supervisory personnel as employees for the purpose of collective bargaining or organizational activity. S. Rep. No. 105, 80th Cong., 1st Sess., pp. 3–5, 28; H. R. Rep. No. 245, 80th Cong., 1st Sess., pp. 13–17.

[6] Compare, *e. g., Globe Steamship Co.* (*Great Lakes Engineers Brotherhood*), 85 N. L. R. B. 475, with *National Maritime Union* (*Standard Oil Co.*), 121 N. L. R. B., at 209–210, and *Graham Transp. Co.* (*Brotherhood of Marine Engineers*), 124 N. L. R. B. 960. See generally, *Labor Board* v. *Brown & Sharpe Mfg. Co.,* 169 F. 2d 331; *Labor Board* v. *Edward G. Budd Mfg. Co.,* 169 F. 2d 571; *Ohio Power Co.* v. *Labor Board,* 176 F. 2d 385; *Labor Board* v. *Quincy Steel Casting Co.,* 200 F. 2d 293. Summarizing the many federal court decisions in this area, the Court of Appeals for the First Circuit recently said, ". . . the gradations of authority 'responsibly to direct' the work of others from that of general manager or other top executive to 'straw boss' are so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor.' " *Labor Board* v. *Swift & Co.,* 292 F. 2d 561, 563.

tional or even local unions may represent both "employees" and "supervisors." [7] For example, is employee participation in any part of a defendant national or local union sufficient, or must "employees" be involved in the immediate labor dispute? [8] What percentage or degree of employee participation in the relevant unit is required? [9] If an organization is open to "employees" or solicits their membership, must there be a showing that there are actually employee members? And, if a local union is not itself a "labor organization," are there conditions under which it may become subject to § 8 (b) as an agent of some other organization which is? [10]

The considerations involved in answering these questions are largely of a kind most wisely entrusted initially to the agency charged with the day-to-day administration of the Act as a whole. The term "labor organization" appears in a number of sections of the Act. Section 8 (a)(2), for example, forbids employers to "dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . . . ." 29 U. S. C. § 158 (a)(2). Section 8 (a)(3) makes it an unfair labor practice for an employer, by certain discriminatory conduct, "to encourage or discourage membership in any labor organization . . . ." 29 U. S. C. § 158 (a)(3). Section 9 (c), dealing with the largely

---

[7] See Labor Board v. Edward G. Budd Mfg. Co., supra, n. 6; International Brotherhood of Teamsters (Di Giorgio Wine Co.), 87 N. L. R. B. 720, enforced, 89 U. S. App. D. C. 155, 191 F. 2d 642.

[8] See, e. g., National Marine Engineers Beneficial Assn. v. Labor Board, 274 F. 2d 167, 173; International Organization of Masters, Mates & Pilots (Chicago Calumet Stevedoring Co.), 125 N. L. R. B. 113, 131–132.

[9] See, e. g., International Organization of Masters, Mates & Pilots v. Labor Board, 48 L. R. R. M. 2624 (C. A. D. C. Cir. 1960).

[10] Compare International Brotherhood of Teamsters (Di Giorgio Wine Co.), 87 N. L. R. B., at 721, 743, with National Maritime Union (Standard Oil Co.), 121 N. L. R. B., at 210.

unreviewable area of representation elections,[11] refers repeatedly to both "employees" and "labor organizations." The policy considerations underlying these and other sections of the Act, and the relationship of a particular definitional approach under § 8 (b) to the meaning of the same term in the various sections, must obviously be taken into account if the statute is to operate as a coherent whole.[12] A centralized adjudicatory process is also essential in working out a consistent approach to the status of the many separate unions which may represent interrelated occupations in a single industry.[13] Moreover, as the national agency charged with the administration of federal labor law, the Board should be free in the first instance to consider the whole spectrum of possible approaches to the question, ranging from a broad definition of "labor organization" in terms of an entire union to a narrow case-by-case consideration of the issue. Only the Board can knowledgeably weigh the effect of either choice upon the certainty and predictability of labor management relations, or assess the importance of simple administrative convenience in this area.[14]

[11] See *Leedom* v. *Kyne,* 358 U. S. 184.

[12] Cf. *International Brotherhood of Teamsters* (*Di Giorgio Wine Co.*), 87 N. L. R. B., at 741.

[13] Cf. *Globe Steamship Co.* (*Great Lakes Engineers Brotherhood*), 85 N. L. R. B., at 478, 480.

[14] See *National Marine Engineers Beneficial Assn.* v. *Labor Board,* 274 F. 2d, at 175, where it was said:

"We earnestly suggest to the Board that the issue whether these two unions, whose activities concern almost every ocean and inland port of the United States, are 'labor organizations' within the meaning of the National Labor Relations Act deserves more thorough treatment than it has had here. Such an investigation would not, of course, have to be performed in every case. Once the Board determined on the basis of a full inquiry that MEBA and MMP were or were not labor organizations, the Board could rely on this unless there was evidence of a change."

182

For these reasons we conclude that the task of determining what is a "labor organization" in the context of § 8 (b) must in any doubtful case begin with the National Labor Relations Board, and that the only workable way to assure this result is for the courts to concede that a union is a "labor organization" for § 8 (b) purposes whenever a reasonably arguable case is made to that effect. Such a case was made in the Minnesota courts.

There persuasive evidence was introduced to show that all the marine engineers employed by the respondents were in fact supervisors.[15]  It was also shown that MEBA had steadfastly maintained in proceedings before the NLRB that it was *not* a labor organization subject to § 8 (b) of the Act.[16]  However, the petitioners introduced into the record two recent Board decisions, one holding

---

[15] The trial court relied, in part, upon the 1949 Labor Board decision in *Globe Steamship Co., supra,* n. 6, which held that certain marine engineers employed on Great Lakes vessels, including those of respondents, were "supervisors" for the purpose of a § 9 (c) election petition.

[16] Respondents introduced an affidavit, filed by MEBA in a prior NLRB proceeding, in which the union claimed to represent only supervisors. This is the affidavit quoted in note 1 of the dissenting opinion, *post,* p. 185.  But, as petitioners pointed out, the Board concluded then, and has continued of the view, that petitioners are "labor organizations" despite such assertions.

The petitioners did not attempt to introduce specific evidence in the state court to prove that they actually represented employees who were not supervisors.  Indeed, the record would seem to indicate that MEBA and Local 101 would ultimately prefer to be classified as supervisory unions outside the ambit of § 8 of the Federal Act.  The actual assertion of NLRB jurisdiction over these unions, however, at the very time the state court action was pending, was more than sufficient to create an arguable case for NLRB jurisdiction under § 8.  It would be entirely inconsistent with our holding in *Garmon* to require the unions affirmatively to abandon in the state court the position they wished to maintain before the NLRB.  It would be equally inconsistent to give evidentiary weight to union affidavits dredged up from prior NLRB proceedings in which the Board rejected the union's self-characterizing claims.

that MEBA was subject to § 8 (b) and was guilty of an unfair labor practice for engaging in an activity similar to that involved in this case,[17] and the other holding that marine engineers represented by a branch of Local 101 were "employees" for the purpose of a § 9 (c) election.[18] The Board's order in the first case was enforced by the Court of Appeals for the Second Circuit on January 13, 1960, during the pendency of the present litigation in the Minnesota trial court.[19]   The state court's attention was expressly called to the Board's theory, subsequently adopted by the Court of Appeals for the Second Circuit, that the relevant unit of membership for determining what is a labor organization in a § 8 (b) context is the entire union, and to the holding that the known membership of a few "employees," provisions in the union's constitution making membership available to "employees," and previous conduct indicative of "employee" representation were sufficient to render the national union a "labor organization."   See 121 N. L. R. B., at 209–210; 274 F. 2d, at 174–175.   Three additional District Court decisions expressly holding that the Board had reasonable cause to believe that MEBA or Local 101 was subject to § 8 (b) had been decided before the issuance of the Minnesota trial court's judgment in the present litigation, although the record does not show that these were specifically brought to the court's attention.[20]

---

[17] *National Maritime Union (Standard Oil Co.), supra,* n. 4.

[18] *Graham Transp. Co. (Brotherhood of Marine Engineers), supra,* n. 6.   An official of Local 101 testified on direct examination that the Brotherhood of Marine Engineers "was merged in our local" on May 29, 1959.

[19] *National Marine Engineers Beneficial Assn.* v. *Labor Board, supra,* n. 8.

[20] *Schauffler* v. *Local 101, Marine Engineers Ben. Assn.,* 180 F. Supp. 932; *Penello* v. *Seafarers' International Union,* 40 L. R. R. M. 2180 (D. C. E. D. Va., 1957).; *Douds* v. *Seafarers' International Union,* 148 F. Supp. 953.

This was a case, therefore, where a state court was shown not simply the arguable possibility of Labor Board jurisdiction over the controversy before it, but that the Board had actually determined the underlying issue upon which its jurisdiction depended, *i. e.*, that MEBA was a "labor organization" for purposes of § 8 (b) of the Act. In the absence of a showing that this position had been authoritatively rejected by the courts,[21] or abandoned by the Labor Board itself, we hold that it was the duty of the state court to defer to the Board's determination.[22]

---

[21] The trial court noted that the Court of Appeals for the Second Circuit had determined that MEBA was not a "labor organization" within the meaning of § 301 of the federal statute. *A. H. Bull Steamship Co.* v. *National Marine Eng. B. Assn.,* 250 F. 2d 332. This case was subsequently distinguished by the Second Circuit in a case under § 8 (b), *National Marine Engineers Beneficial Assn.* v. *Labor Board, supra,* n. 8, and in *United States* v. *National Marine Engineers' Ben. Assn.,* 294 F. 2d 385. Subsequent to the trial court's decision in the present case the Court of Appeals for the District of Columbia Circuit ordered the NLRB to take additional evidence and to reconsider its determination of a similar maritime union's status as a "labor organization." *International Organization of Masters, Mates & Pilots* v. *Labor Board, supra,* n. 9. At the most these court decisions would only serve to cast some doubt on the validity of the Board's determination. But even if the doubt were much more substantial, the *Garmon* doctrine would require a state court to decline jurisdiction of the controversy.

[22] To distinguish the several NLRB decisions on the ground that each involved marine engineers whose jobs were unlike those of the respondents' engineers, as the Minnesota courts sought to do, is inconsistent with all that *Garmon* teaches. Such a distinction can be made only on the assumption that the relevant unit in determining what is a "labor organization" for purposes of § 8 (b) is no more than the group of employees involved in the then-pending dispute. The validity of this very assumption is currently being litigated before the Labor Board and reviewing courts. Far from having been authoritatively accepted, this limited view of the relevant unit has at least twice been expressly rejected. *National Marine Engineers Beneficial Assn.* v. *Labor Board,* 274 F. 2d, at 173, enforcing 121 N. L. R. B. 208; *International Organization of Masters, Mates & Pilots (Chicago*

The need for protecting the exclusivity of NLRB jurisdiction is obviously greatest when the precise issue brought before a court is in the process of litigation through procedures originating in the Board. While the Board's decision is not the last word, it must assuredly be the first. In addition, when the Board has actually undertaken to decide an issue, relitigation in a state court creates more than theoretical danger of actual conflict between state and federal regulation of the same controversy.[23] "Our concern" here, as it was in the *Garmon* case, 359 U. S., at 246, "is with delimiting areas . . . which must be free from state regulation if national policy is to be left unhampered."

*Reversed.*

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

While I agree with the principles announced by the Court, I disagree with the result that is reached on the facts of this case. The record contains an affidavit of the President of this union, the Marine Engineers Beneficial Association (MEBA), which states that all members of the union, including the local involved in this case, perform supervisory functions.[1]

---

*Calumet Stevedoring Co.*), 125 N. L. R. B., at 131–132, remanded for reconsideration on other grounds, 48 L. R. R. M. 2624 (C. A. D. C. Cir. 1960).

[23] Illustrative of this danger is a recent Federal District Court decision granting an application by a Regional Director of the Board for a temporary injunction against Local 101 prohibiting organizational activity similar to that involved in the present case. *Schauffler v. Local 101, Marine Engineers Ben. Assn., supra,* n. 20. See also other cases cited, n. 20, *supra.*

[1] "I can state most categorically that licensed marine engineers who comprise the entire members of MEBA, without a single exception in the nature of their work, have authority in the interests of the em-

An officer of MEBA testified:

"Local 101 of the Marine Engineers Beneficial Association is comprised of those men who are licensed as marine engineers by the United States Coast Guard, and those men who perform the engineering duties of engineers, whether or not they are licensed by the Coast Guard."

The record makes clear that a licensed engineer has supervisory duties whenever there is someone working under him. That status is grounded in the historic distinction between licensed and unlicensed personnel and is shown by this record.[2] A union of masters and mates

---

ployer for whom they may be working to hire, transfer, suspend, lay off, recall, promote, discharge, fine, reward or discipline the unlicensed personnel who work in the engine department, over which the licensed engineers have supervision or responsibility to direct such unlicensed personnel in the engine department or adjust the grievances of the unlicensed personnel in the engine department, or to effectively recommend any such action. In furtherance of their duties, licensed engineers do not exercise the authority just described merely as a routine or clerical nature, but they must exercise the use of independent judgment. Every single member of MEBA performs work of the nature which I have just described. The type of marine personnel over whom the MEBA assumes jurisdiction and takes in as members, is precisely that which I have just described. We do not have any members who do not fall within such description, insofar as their duties and responsibilities are concerned."

[2] The findings state: "All engineers and assistant engineers employed on Interlake vessels stand watches during which they are in charge of and responsible for the operation and condition of the vessel's propulsion mechanism and responsibly direct, control and supervise the work of the firemen, oilers and coal passers on duty during such watch; they hire, fire, transfer and change the status of and discipline the persons working under them and have authority to and do make effective recommendations respecting the employment and tenure of employment of the people working under them; they handle initially grievances of the employees who are subject to their supervision; the exer-

would plainly be a union of supervisors and under present law not be qualified to represent ordinary seamen. If there are rare instances when an engineer on a tug, for example, is nothing more than an employee, that has not been shown in the record and is directly contrary to the affidavit of this union's president.

The trial court in this case said that the record "does not show" that this MEBA Local "admits to membership any non-supervisory employee, and in any event it is clear that its membership is composed primarily and almost exclusively of supervisors." That finding is not challenged here. Petitioners, placing all their hopes on the words of the trial court that this local is composed "primarily and almost exclusively of supervisors," say it may therefore be arguably and reasonably contended that the local is a labor organization within the meaning of the Act.

Section 2 (5) defines "labor organization" as any organization "in which employees participate" for the purpose "of dealing with employers concerning grievances," etc.

The word "employee" was redefined by Congress [3] following our decision in *Packard Co.* v. *Labor Board,* 330 U. S. 485, so as to exclude "any individual employed as a supervisor." § 2 (3). And § 14 (a) provides that "Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this Act shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining."

---

cise of authority by the engineers and assistant engineers requires the use of independent judgment and discretion; and all such engineers are required to be licensed by the United States Coast Guard."

[3] See H. R. Rep. No. 245, 80th Cong., 1st Sess., p. 23; S. Rep. No. 105, 80th Cong., 1st Sess., p. 28.

There is not a shred of evidence in this record showing that any employee *not a supervisor* is a member of this union. There is therefore not a shred of evidence to show that this local of MEBA is a "labor organization." Since there is not, it has made no showing that it is entitled to any of the protections of the Federal Act. Such a showing is within its power to make. It apparently claims to be a "labor organization" when it is to its advantage to do so and protests against being so labeled when that position serves its end.[4]

If it desires the protection of the Federal Act, it should be required to come forth with evidence showing who its members are. In absence of such a showing, we should not disturb the rulings of the Minnesota courts, which on this record were fully justified in enjoining the picketing. It was indeed conceded by counsel for MEBA at the trial that the purpose of the picketing was "to improve the wages, hours and working conditions" of the "licensed engineers," not the wages, hours and working conditions of those few undisclosed individuals who it is now intimated may have been members of the union.

Since this local is not on this record a "labor organization," it does not come within the purview of § 8 (b)(2) or § 8 (b)(4), which makes certain practices, alleged to have taken place here, unfair labor practices. For § 14, quoted above, returned supervisors to the basis which they enjoyed prior to the Federal Act. *Bull S. S. Co.* v. *National Marine Eng. B. Assn.*, 250 F. 2d 332.

---

[4] Cf. with the decision below the contentions of MEBA in *National Marine Engineers Ben. Assn.* v. *Labor Board*, 274 F. 2d 167, 170 ("MEBA says its membership is composed exclusively of supervisors") and *Schauffler* v. *Local 101, Marine Engineers Ben. Assn.*, 180 F. Supp. 932, 935 (where the local involved in the present case argued that it was not a labor organization within the meaning of the Act). In *National Organization of Masters, Mates, and Pilots of America, et al.*, 116 N. L. R. B. 1787, MEBA admitted it was a "labor organization" within the meaning of the Act.

It matters not that at other times this local or MEBA may have been a "labor organization" for purposes of the Federal Act.[5] Apparently an engineer may at times be only an ordinary employee.[6] So for one operation this local may have members doing the work of nonsupervisory employees. Whether its status would therefore change from day-to-day or week-to-week might be presented in some case. It is not presented here, for, on a record showing only supervisors among the membership list, the union has no claim to shelter under the Federal Act.

---

[5] The finding of the Labor Board in *National Marine Engineers Ben. Assn.* v. *Labor Board*, 274 F. 2d 167, that MEBA was a "labor organization" turned on a narrow procedural point mentioned by the Court of Appeals: "MEBA and MMP know who their members are and, if they do not know what their members do, certainly they can find out. The Board could properly have thought that the matters placed in the record by the general counsel justified an inference that non-supervisors do participate in MEBA and MMP, and that this sufficed for the Board's finding to that effect unless they were rebutted by more convincing evidence than the unions offered here. We therefore cannot say the Board's finding that MEBA and MMP were labor organizations did not meet the standards laid down in *Universal Camera Corp.* v. *N. L. R. B.*, 1951, 340 U. S. 474, 71 S. Ct. 456, 95 L. Ed. 456." 274 F. 2d, at 175.

[6] See *National Marine Engineers Ben. Assn.* v. *Labor Board*, 274 F. 2d 167, 172–173: "The Board's general counsel did not dispute that two of the three engineers on the Franklin D. Roosevelt, the chief engineer and the relief chief engineer, were supervisors; but there was much argument whether the third should be so considered since he exercised supervisory duties only when neither the chief engineer nor the relief chief engineer was about. See *N. L. R. B.* v. *Quincy Steel Casting Co.*, 1st Cir., 1952, 200 F. 2d 293. The general counsel claimed that at least one of the engineers on the Sandra Marie could not have been a supervisor since he had no one to supervise. See *General Foods Corp.*, 110 N. L. R. B. 1088 (1954). MEBA disputed this, as well as the contention relating to the third engineer on the Franklin D. Roosevelt, claiming that these engineers were qualified and on these ships normally would have someone to supervise."